# CALIFORNIA *v.* SUPERIOR COURT OF CALIFORNIA, SAN BERNARDINO COUNTY (SMOLIN ET AL., REAL PARTIES IN INTEREST)

No. 86–381.   Argued April 22, 1987—Decided June 9, 1987

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN J., joined, *post*, p. 412.

*J. Robert Jibson*, Supervising Deputy Attorney General of California, argued the cause for petitioner. With him on the brief were *John K. Van de Kamp*, Attorney General, and *Steve White*, Chief Assistant Attorney General.

*Dennis P. Riordan* argued the cause for respondent. With him on the brief was *Karen L. Snell*.*

---

*A brief of *amici curiae* urging reversal was filed for the State of Alaska et al. by *James E. Tierney*, Attorney General of Maine, *William R. Stokes*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Harold M. Brown* of Alaska, *Corinne K. A. Watanabe* of Hawaii, *Jim Jones* of Idaho, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *David L. Armstrong* of Kentucky, *William J. Guste, Jr.*, of Louisiana, *Mike Greely* of Montana, *Brian McKay* of Nevada, *Stephen E. Merrill* of New Hampshire, *Michael Turpen* of Okla-

JUSTICE O'CONNOR delivered the opinion of the Court.

At issue in this case are the limits imposed by federal law upon state court habeas corpus proceedings challenging an extradition warrant.

I

Richard and Judith Smolin were divorced in California in 1978. Sole custody of their two children, Jennifer and Jamie, was awarded to Judith Smolin, subject to reasonable visitation rights for Richard. Until November 1979, all the parties remained in San Bernardino County, California, and Richard apparently paid his child support and exercised his visitation rights without serious incident. In August 1979, however, Judith married James Pope, and in November, Mr. Pope's work required that the family relocate to Oregon. When the Popes moved without informing Richard, the battle over the custody of the minor children began in earnest.

It is unnecessary to recite in detail all that ensued. Richard alleged, and the California courts later found, that the Popes deliberately attempted to defeat Richard's visitation rights and to preclude him from forming a meaningful relationship with his children in the course of their succeeding relocations from Oregon to Texas to Louisiana. On February 13, 1981, the Popes obtained a decree from a Texas court granting full faith and credit to the original California order awarding sole custody to Judith. Richard was served but did not appear in the Texas proceeding. Before the Texas decree was issued, however, Richard sought and obtained in California Superior Court modification of the underlying California decree, awarding joint custody to Richard and Judith. Though properly served, the Popes did not appear in these

homa, *LeRoy S. Zimmerman* of Pennsylvania, *Hector Rivera Cruz* of Puerto Rico, *Mark V. Meierhenry* of South Dakota, *J. Michael Cody* of Tennessee, *Jim Mattox* of Texas, *David L. Wilkinson* of Utah, *Leroy A. Mercer* of The Virgin Islands, and *Archie G. McClintock* of Wyoming.

*Ephraim Margolin* filed a brief for California Attorneys for Criminal Justice et al. as *amici curiae* urging affirmance.

California proceedings; and, though served with the modification order, the Popes neither complied with its terms, nor notified the Texas court of its existence. On January 9, 1981, Richard instituted an action in California Superior Court to find Judith in contempt and to again modify the custody decree to give him sole custody. In February 1981, sole custody was granted to Richard by the California court, subject to reasonable visitation rights for Judith.

This order also was ignored by the Popes, apparently acting on the advice of counsel that the California courts no longer had jurisdiction over the matter. Richard did not in fact obtain physical custody for over two years. When he finally located the Popes in Louisiana, they began an adoption proceeding, later described by the California courts as "verging on the fraudulent," to sever Richard's legal tie to Jennifer and Jamie. App. 51. After securing a California warrant to obtain custody of the children on February 27, 1984, Richard and his father, Gerard Smolin, resorted to self-help. On March 9, 1984, they picked up Jennifer and Jamie as they were waiting for their school bus in Slidell, Louisiana, and brought them back to California. On April 11, 1984, the Popes submitted to the jurisdiction of the California Superior Court and instituted an action to modify the 1981 order granting Richard sole custody. 41 Cal. 3d 758, 764, n. 4, 716 P. 2d 991, 994, n. 4 (1986). Those proceedings are apparently still pending before the California courts.

Meanwhile, the Popes raised the stakes by instituting a criminal action against Richard and Gerard Smolin in Louisiana. On April 30, 1984, *after* the Popes instituted modification proceedings in California, Judith Pope swore out an affidavit charging Richard and Gerard Smolin with kidnaping Jennifer and Jamie from her custody and asserting that they had acted "without authority to remove children from [her] custody." App. B to Pet. for Cert. 6. On the basis of this affidavit, the Assistant District Attorney for the 22d Judicial District of Louisiana, William Alford, Jr., filed an informa-

tion charging Richard and Gerard Smolin each with two counts of violating La. Rev. Stat. Ann. § 14:45 (West 1986), the Louisiana kidnaping statute. On June 14, 1984, the Governor of Louisiana formally notified the Governor of California that Richard and Gerard Smolin were charged with "simple kidnaping" in Louisiana and demanded that they be delivered up for trial. 41 Cal. 3d, at 763, 716 P. 2d, at 993–994.

In early August 1984, the Smolins petitioned in the California Superior Court for a writ of habeas corpus to block the anticipated extradition warrants. On August 17, 1984, the anticipated warrants issued and on August 24, 1984, the Superior Court orally granted a writ of habeas corpus after taking judicial notice of the various custody orders that had been issued. The court concluded "that the findings in the family law case adequately demonstrate that, in fact, the process initiated by Mrs. Pope in Louisiana and her declarations and affidavits were totally insufficient to establish any basis for rights of either herself personally or for the State . . . of Louisiana." App. C to Pet. for Cert. 5. California then sought a writ of mandate in the California Court of Appeal on the ground that the Superior Court had abused its discretion in blocking extradition. The Court of Appeal reluctantly issued the writ:

> "Although we abhor Judy's apparent willingness to take advantage of our federal system to further this custody battle, and are sympathetic to [the Smolins'] position, we must conclude that their arguments are irrelevant to the only issue a court in the asylum state may properly address: are the documents on their face in order." App. B to Pet. for Cert. 16.

A divided California Supreme Court reversed. The majority interpreted the Superior Court's finding to be that the Smolins were not substantially charged with a crime. It found that the California custody decrees were properly con-

sidered by the Superior Court, and that its conclusion that the Smolins were not substantially charged was correct. Under the full faith and credit provisions of the federal Parental Kidnaping Prevention Act of 1980, 28 U. S. C. § 1738A, the majority determined that those decrees conclusively established that Richard Smolin was the lawful custodian of the children at the time that they were taken from Louisiana to California.* Finally, the court found that, under Louisiana law, the lawful custodian cannot be guilty of kidnaping children in his custody. *State* v. *Elliott*, 171 La. 306, 311, 131 So. 28, 30 (1930). We granted certiorari, 479 U. S. 982 (1986), to consider whether the Extradition Clause, Art. IV, § 2, cl. 2, and the Extradition Act, 18 U. S. C. § 3182, prevent the California Supreme Court from refusing to permit extradition on these grounds.

## II

The Federal Constitution places certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union. One such limit is found in Art. IV, § 2, cl. 2, the Extradition Clause:

"A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Author-

---

*The California Supreme Court found that under the Parental Kidnaping Prevention Act, California had exclusive modification jurisdiction over the original custody decree. 41 Cal. 3d 758, 770, 716 P. 2d 991, 999 (1986). See 28 U. S. C. § 1738A(d) ("The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as [such court has jurisdiction under the law of such State] and such State remains the residence of the child or any contestant"); 28 U. S. C. § 1738A(f) ("A court of a State may modify a determination of the custody of the same child made by a court of another State, if— . . . (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination").

ity of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

The obvious objective of the Extradition Clause is that no State should become a safe haven for the fugitives from a sister State's criminal justice system. As this Court noted in its first opportunity to construe the Extradition Clause:

> "[T]he statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government; and that nothing would be more likely to disturb its peace, and end in discord, than permitting an offender against the laws of a State, by passing over a mathematical line which divides it from another, to defy its process, and stand ready, under the protection of the State, to repeat the offence as soon as another opportunity offered." *Kentucky* v. *Dennison*, 24 How. 66, 100 (1861).

The Extradition Clause, however, does not specifically establish a procedure by which interstate extradition is to take place, and, accordingly, has never been considered to be self-executing. See, *e. g., Hyatt* v. *People ex rel. Corkran*, 188 U. S. 691, 708–709 (1903); *Kentucky* v. *Dennison, supra,* at 104. Early in our history, the lack of an established procedure led to a bitter dispute between the States of Virginia and Pennsylvania. J. Scott, Law of Interstate Rendition 5–7 (1917). In 1791, Pennsylvania demanded the extradition of three men charged with kidnaping a free black man and selling him into slavery. Virginia refused to comply with Pennsylvania's demand. The controversy was finally submitted to President Washington who, relying upon the advice of Attorney General Randolph, 9 National State Papers of the United States 1789–1817, pt. II, pp. 144–145 (E. Carzo ed. 1985), personally appeared before the Congress to obtain the enactment of a law to regulate the extradition process. Con-

gress responded by enacting the Extradition Act of 1793, which provides in its current form:

> "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear." 18 U. S. C. § 3182.

This Court has held the Extradition Act of 1793 to be a proper exercise of Congress' powers under the Extradition Clause and Art. IV, § 1, to "prescribe the manner in which acts, records and proceedings shall be proved, and the effect thereof." *Kentucky* v. *Dennison, supra,* at 105; *Prigg* v. *Pennsylvania,* 16 Pet. 539, 618–622 (1842). By the express terms of federal law, therefore, the asylum State is bound to deliver up to the demanding State's agent a fugitive against whom a properly certified indictment or affidavit charging a crime is lodged.

The language, history, and subsequent construction of the Extradition Act make clear that Congress intended extradition to be a summary procedure. As we have repeatedly held, extradition proceedings are "to be kept within narrow bounds"; they are "emphatically" not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party. *Biddinger* v. *Commissioner*

*of Police,* 245 U. S. 128, 135 (1917); see also, *e. g., Michigan v. Doran,* 439 U. S. 282, 288 (1978); *Drew* v. *Thaw,* 235 U. S. 432, 440 (1914); *Pierce* v. *Creecy,* 210 U. S. 387, 405 (1908); *In re Strauss,* 197 U. S. 324, 332–333 (1905). Those inquiries are left to the prosecutorial authorities and courts of the demanding State, whose duty it is to justly enforce the demanding State's criminal law — subject, of course, to the limitations imposed by the Constitution and laws of the United States. *Biddinger* v. *Commissioner of Police, supra,* at 135; *Drew* v. *Thaw, supra,* at 440. The courts of asylum States may do no more than ascertain whether the requisites of the Extradition Act have been met. As the Court held in *Michigan* v. *Doran, supra,* the Act leaves only four issues open for consideration before the fugitive is delivered up:

> "(a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive." 439 U. S., at 289.

The parties argue at length about the propriety of the California courts taking judicial notice of their prior child custody decrees in this extradition proceeding. But even if taking judicial notice of the decrees is otherwise proper, the question remains whether the decrees noticed were relevant to one of these four inquiries. The Smolins do not dispute that the extradition documents are in order, that they are the persons named in the documents and that they meet the technical definition of a "fugitive." Their sole contention is that, in light of the earlier California custody decrees and the federal Parental Kidnaping Prevention Act of 1980, 28 U. S. C. § 1738A, they have not been properly charged with a violation of Louisiana's kidnaping statute, La. Rev. Stat. Ann. § 14:45 (West 1986).

Section 14:45A(4) prohibits the

> "intentional taking, enticing or decoying away and removing from the state, by any parent, of his or her child, from the custody of any person to whom custody has been awarded by any court of competent jurisdiction of any state, without the consent of the legal custodian, with intent to defeat the jurisdiction of the said court over the custody of the child."

A properly certified Louisiana information charges the Smolins with violating this statute by kidnaping Jennifer and Jamie Smolin. The information is based on the sworn affidavit of Judith Pope which asserts:

> " 'On March 9, 1984, at approximately 7:20 a. m., Richard Smolin and Gerard Smolin, kidnapped Jennifer Smolin, aged 10, and James C. Smolin, aged 9, from the affiant's custody while said children were at a bus stop in St. Tammany Parish, Louisiana.
>
> "The affiant has custody of the said children by virtue of a Texas court order dated February 5, 1981, a copy of said order attached hereto and made part hereof. The information regarding the actual kidnapping was told to the affiant by witnesses Mason Galatas and Cheryl Galatas of 2028 Mallard Street, Slidell, Louisiana, and Jimmie Huessler of 2015 Dridle Street, Slidell, Louisiana. Richard Smolin and Gerard Smolin were without authority to remove children from affiant's custody.' "
> App. B to Pet. for Cert. 5–6.

The information is in proper form, and the Smolins do not dispute that the affidavit, and documents incorporated by reference therein, set forth facts that clearly satisfy each element of the crime of kidnaping as it is defined in La. Rev. Stat. Ann. § 14:45A(4) (West 1986). If we accept as true every fact alleged, the Smolins are properly charged with kidnaping under Louisiana law. In our view, this ends the inquiry into the issue whether or not a crime is charged for purposes of the Extradition Act.

The Smolins argue, however, that more than a formal charge is required, citing the following language from *Roberts* v. *Reilly*, 116 U. S. 80, 95 (1885):

"It must appear, therefore, to the governor of the State to whom such a demand is presented, before he can lawfully comply with it, first, that the person demanded is substantially charged with a crime against the laws of the State from whose justice he is alleged to have fled, by an indictment or an affidavit, certified as authentic by the governor of the State making the demand. . . .

"[This] is a question of law, and is always open upon the face of the papers to judicial inquiry, on an application for a discharge under a writ of *habeas corpus.*"

The Smolins claim that this language in *Roberts* spawned a widespread practice of permitting the fugitive, upon a petition for writ of habeas corpus in the asylum State's courts, to show that the demanding State's charging instrument is so insufficent that it cannot withstand some generalized version of a motion to dismiss or common-law demurrer. Tr. of Oral Arg. 29–36. The cases the Smolins principally rely upon as support for this asserted practice are *People ex rel. Lewis* v. *Commissioner of Correction of City of New York*, 100 Misc. 2d 48, 417 N. Y. S. 2d 377 (1979), aff'd, 75 App. Div. 2d 526, 426 N. Y. S. 2d 969 (1980), and *Application of Varona*, 38 Wash. 2d 833, 232 P. 2d 923 (1951). See Brief for Respondent 15–17. In *Lewis*, however, the New York trial court actually granted extradition despite its apparent misgivings about the substantiality of the criminal charge. *Lewis, supra*, at 56, 417 N. Y. S. 2d, at 382. And, in *Varona*, the Washington Supreme Court relied on the fact that the indictment, on its face, did not charge a crime under California law. *Application of Varona, supra*, at 833–834, 232 P. 2d, at 923–924. Neither case, in our view, supports the broad proposition that the asylum State's courts may entertain motions to dismiss or demurrers to the indictment or information from the demanding State.

To the contrary, our cases make clear that no such inquiry is permitted. For example, in *Pierce* v. *Creecy*, decided after *Roberts, supra*, this Court refused to grant relief from extradition over multiple objections to the sufficiency of the indictment. The *Pierce* Court concluded that it was enough that "the indictment, whether good or bad, as a pleading, unmistakably describes every element of the crime of false swearing, as it is defined in the Texas Penal Code . . . ." 210 U. S., at 404. It reasoned:

> "If more were required it would impose upon courts, in the trial of writs of *habeas corpus*, the duty of a critical examination of the laws of States with whose jurisprudence and criminal procedure they can have only a general acquaintance. Such a duty would be an intolerable burden, certain to lead to errors in decision, irritable to the just pride of the States and fruitful of miscarriages of justice. The duty ought not be assumed unless it is plainly required by the Constitution, and, in our opinion, there is nothing in the letter or the spirit of that instrument which requires or permits its performance." *Id.*, at 405.

Similarly, in *Biddinger* v. *Commissioner of Police*, 245 U. S. 128 (1917), the appellant argued that he had a seemingly valid statute of limitations defense based on the fact that more than three years, the limitations period, had elapsed since the date of the crime recited in the indictment and that he had been publicly and openly resident in the demanding State for that entire period. The Court found that the question of limitations was properly considered only in the demanding State's courts. *Id.*, at 135; see also *Drew* v. *Thaw*, 235 U. S., at 439–440 (whether the escape of a person committed to a mental institution is a crime "is a question as to the law of New York which the New York courts must decide").

This proceeding is neither the time nor place for the Smolins' arguments that Judith Pope's affidavit is fraudulent

and that the California custody decrees establish Richard as the lawful custodian under the full faith and credit provision of the federal Parental Kidnaping Prevention Act of 1980. There is nothing in the record to suggest that the Smolins are not entirely correct in all of this: that California had exclusive modification jurisdiction over the custody of Jennifer and Jamie; that, under the California decrees, Richard Smolin had lawful custody of the children when he brought them to California; and, that, accordingly, the Smolins did not violate La. Rev. Stat. Ann. § 14:45A(4) (West 1986) as is charged. Of course, the Parental Kidnaping Prevention Act of 1980 creates a uniform federal rule governing custody determinations, a rule to which the courts of Louisiana must adhere when they consider the Smolins' case on the merits. We are not informed by the record why it is that the States of California and Louisiana are so eager to force the Smolins halfway across the continent to face criminal charges that, at least to a majority of the California Supreme Court, appear meritless. If the Smolins are correct, they are not only innocent of the charges made against them, but also victims of a possible abuse of the criminal process. But, under the Extradition Act, it is for the Louisiana courts to do justice in this case, not the California courts: "surrender is not to be interfered with by the summary process of *habeas corpus* upon speculations as to what ought to be the result of a trial in the place where the Constitution provides for its taking place." *Drew* v. *Thaw, supra,* at 440. The judgment of the California Supreme Court is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, dissenting.

There is no constitutional or statutory reason why the scope of an asylum State's judicial inquiry need be so narrow that it precludes the grant of habeas corpus in this case. It has been settled for over a century that before the Governor of an asylum State can lawfully comply with a requesting

State's demand for extradition, it must appear that the person sought is "substantially charged with a crime" and is also a fugitive from justice. *Roberts* v. *Reilly,* 116 U. S. 80, 95 (1885).[1] "The first of these prerequisites is a question of law, and is always open upon the face of the papers to judicial inquiry, on an application for a discharge under a writ of *habeas corpus." Ibid.* Because there is no reasonable possibility that the charges of simple kidnaping filed against Richard and Gerard Smolin in Louisiana are valid, I agree with the California Supreme Court's conclusion that they have not been substantially charged with a crime. In addition, the Parental Kidnaping Prevention Act of 1980, 28 U. S. C. § 1738A, makes clear that Richard had custody of his daughters and thus there is no reasonable possibility that his travel from Louisiana to California with them made him a fugitive from justice.

## I

The scope of the legal inquiry preceding extradition is extremely restricted because the courts of the asylum State cannot be expected to make "a critical examination of the laws of States with whose jurisprudence and criminal procedure they can have only a general acquaintance." *Pierce* v. *Creecy,* 210 U. S. 387, 405 (1908). Nevertheless, our precedents make clear that if a critical allegation of fact in the indictment is "impossible in law," see *Roberts,* 116 U. S., at 96, the asylum State must refuse the extradition demand because the person has not been substantially charged with a crime. *Munsey* v. *Clough,* 196 U. S. 364, 373 (1905). In *Drew* v. *Thaw,* 235 U. S. 432 (1914), the habeas corpus petitioner was under a New York indictment for conspiracy to obstruct the due administration of laws; he was charged with plotting to effect his own escape from an insane asylum to which he had been committed. Justice Holmes' opinion for

[1] See also *Hyatt* v. *Corkran,* 188 U. S. 691, 709–710 (1903); *Munsey* v. *Clough,* 196 U. S. 364, 372–373 (1905); *Pierce* v. *Creecy,* 210 U. S. 387, 401, 405 (1908).

the Court held that the indictment charged a crime because New York courts could decide that the conspiracy charged "did tend to obstruct the due administration of the law." *Id.*, at 439. Even though the habeas court could not inquire "upon the facts or the law of the matter to be tried," Justice Holmes made it clear that there nevertheless must be a "reasonable possibility" that the crime charged "may be such." *Id.*, at 439–440.[2]

In *Pierce* v. *Creecy*, the Court acknowledged that "an objection which, if well founded, would destroy the sufficiency of the indictment, as a criminal pleading, might conceivably go far enough to destroy also its sufficiency as a charge of crime." 210 U. S., at 404. The Court concluded that the objections to the indictment in that case were not of that nature. Likewise, in *In re Strauss,* 197 U. S. 324 (1905), Ohio sought a fugitive who had been charged by affidavit before a justice of the peace for a felony which was subject to trial only upon an indictment. This Court found no constitutional barrier to extradition on those facts, but observed that the availability of extradition must be balanced against the duty of courts to avoid injustice:

> "It may be true, as counsel urge, that persons are sometimes wrongfully extradited, particularly in cases like the present; that a creditor may wantonly swear to an affidavit charging a debtor with obtaining goods under false pretenses. . . . While courts will always endeavor to see that no such attempted wrong is successful, on the other hand care must be taken that the

---

[2] "When, as here, the identity of the person, the fact that he is a fugitive from justice, the demand in due form, the indictment by a grand jury for what it and the Governor of New York allege to be a crime in that State *and the reasonable possibility that it may be such,* all appear, the constitutionally required surrender is not to be interfered with by the summary process of *habeas corpus* upon speculations as to what ought to be the result of a trial in the place where the Constitution provides for its taking place." *Drew* v. *Thaw,* 235 U. S. 432, 440 (1914) (emphasis supplied).

process of extradition be not so burdened as to make it practically valueless." *Id.*, at 332–333.

The inquiry undertaken by the California courts in this case established the "impossibility in law" of convicting the Smolins and therefore the injustice of their extradition. The crime charged was two counts of simple kidnaping in violation of Louisiana law, which defines the crime, in relevant part, as:

> "The intentional taking, enticing or decoying away and removing from the state, by any parent of his or her child, from the custody of any person to whom custody has been awarded by any court of competent jurisdiction of any state, without the consent of the legal custodian, with intent to defeat the jurisdiction of the said court over the custody of the child." La. Rev. Stat. Ann. § 14:45A(4) (West 1986).

In my opinion the limited scope of the inquiry open to the California courts in this case did not preclude an examination of either federal law or California's own judicial decrees. This summary examination was permissible because it had a direct bearing on whether the information "substantially charged" the Smolins with a crime or whether there was no reasonable possibility that the crime of simple kidnaping charged "may be such." *Drew* v. *Thaw,* 235 U. S., at 440.

The Smolins' conviction for this crime was an impossibility for three reasons. First, a California court, the court of competent jurisdiction under the federal Parental Kidnaping Prevention Act,[3] had awarded sole custody of Jennifer and Jamie to Richard Smolin more than three years before he took them to California; he plainly could not be convicted of removing the children from his own custody. Second, regardless of whether Richard or Judith Smolin had custody of the children, he clearly believed that custody had been

---

[3] See *ante,* at 405, n.

awarded to him by a California court which retained jurisdiction. His act of taking the children to California therefore could not have been accomplished with the intent to defeat the jurisdiction of that court. Third, because he did not believe that a Louisiana court had jurisdiction over the custody determination, he could not logically be convicted under the kidnaping statute for departing from Louisiana with the intent to defeat the jurisdiction of the courts of that State. There is, in short, no possibility—and certainly no "reasonable possibility"—that his conduct violated the Louisiana statute cited in the extradition papers.[4] A sensible application of the requirement that a fugitive must be "substantially charged" with a crime, informed by the twin necessities of avoiding a trial-like inquiry into the law of sister States and preventing the injustice of extradition to face a legally impossible charge, leads me to conclude that the judgment of the California Supreme Court should be affirmed.

The Court's heavy reliance on the dicta in *Michigan* v. *Doran*, 439 U. S. 282, 288 (1978), and *Biddinger* v. *Commissioner of Police*, 245 U. S. 128, 135 (1917), is misplaced. The issue in *Doran* was whether a court in the asylum State could review the demanding State's judicial determination that there was probable cause for the fugitive's arrest—an issue that is entirely unrelated to the substantiality of the criminal charge. The fact that the Court omitted the word "substan-

---

[4] The Louisiana Assistant District Attorney who filed the information against the Smolins was aware of the California custody orders at the time he filed the information. He believed, however, that a crime had been committed because " 'he viewed the California judgment as being void, having been obtained by fraudulent misrepresentations, and the valid order having been that issued by Texas on February 13, 1981.' " 41 Cal. 3d 758, 763, n. 1, 716 P. 2d 991, 993, n. 1 (1986). In my opinion that speculation on the part of the Assistant District Attorney is inadequate to overcome the fact that Richard Smolin, as the holder of a custody determination that was valid on its face, could not be substantially charged with a crime for his exercise of the parental rights conferred upon him by that custody determination.

tial" in its summary description of the proper inquiry in the asylum State surely was not intended to modify or eliminate a requirement that this Court had recognized for decades. See, *e. g.*, *McNichols* v. *Pease*, 207 U. S. 100, 108–109 (1907) (accused must be "substantially charged with crime against the laws of the demanding State"); *Ex parte Reggel*, 114 U. S. 642, 651 (1885) (indictment accompanying the requisition was valid because it substantially charged the crime). In recognition of this longstanding requirement, the Uniform Criminal Extradition Act, which both Louisiana and California have adopted, specifies that the "indictment, information, or affidavit made before the magistrate must substantially charge the person demanded with having committed a crime under the law of that state." 11 U. L. A. 92 (1974); La. Code Crim. Proc. Ann., Art. 263 (West 1967); Cal. Penal Code Ann. § 1548.2 (West 1982).

The *Biddinger* case relied upon by the Court is also inapposite because the validity of the fugitive's statute of limitations defense in that case depended on the law of the demanding State; the fact that the limitations period had expired between the date of the offense and the charge did not foreclose the possibility that the statute had been tolled. 245 U. S., at 131–132, 135. The common thread in *Doran* and *Biddinger*, as in *Drew* v. *Thaw, supra*, is that an asylum state court's inquiry may not reach the merits of issues that could be fully litigated in the charging State; such examinations entangle the asylum State's judicial system in laws with which it is unfamiliar and endanger the summary nature of extradition proceedings. To obtain habeas relief, "[t]here must be objections which reach deeper into the indictment than those which would be good against it in the court where it is pending." *Pierce* v. *Creecy*, 210 U. S., at 401; cf. *Pacileo* v. *Walker*, 449 U. S. 86, 87–88 (1980) *(per curiam)* (California Supreme Court erred in granting habeas relief to fugitive by directing its Superior Court to determine whether prison conditions in demanding State violated Eighth Amendment).

Neither of those dangers is posed by the respondent California Superior Court's conclusion that the Smolins had legal custody and thus were not "substantially charged" with kidnaping.[5]

## II

Prima facie proof that the accused be "a fugitive from the justice of the demanding State" is a "condition precedent to the surrender of the accused." *Ex parte Reggel*, 114 U. S., at 652–653. Deeming Richard Smolin a "fugitive from justice" would not serve the purpose of the Extradition Clause. The Framers' provision for extradition was designed to prevent state boundaries from becoming impermeable walls within which "the fugitives from a sister State's criminal justice system" may find "safe haven." *Ante*, at 406 (quoting *Kentucky* v. *Dennison*, 24 How. 66, 100 (1861)); cf. *Jones* v. *Helms*, 452 U. S. 412, 419 (1981) (State's right to obtain extradition of criminal necessarily qualifies that citizen's right to interstate travel). The requirement that fugitivity be established nevertheless has some teeth to it;[6] otherwise state boundaries would become mere markings in an atlas, and the demanding State could exercise criminal jurisdiction over a person anywhere in the Union regardless of the extent

---

[5] An asylum State's review of a determination by a magistrate in the requesting State that probable cause exists to arrest the fugitive may cause "friction and delay," but nothing indicates that "routine and basic inquiry" into the existence of a charge "has led to frustration of the extradition process." *Michigan* v. *Doran*, 439 U. S. 282, 296–297, n. 7 (1978) (BLACKMUN, J., concurring in result).

[6] "Any other interpretation would lead to the conclusion that the mere requisition by the executive of the demanding State, accompanied by the copy of an indictment, or an affidavit before a magistrate, certified by him to be authentic, charging the accused with crime committed within her limits, imposes upon the executive of the State or Territory where the accused is found, the duty of surrendering him, although he may be satisfied, from incontestable proof, that the accused had, in fact, never been in the demanding State, and, therefore, could not be said to have fled from its justice." *Ex parte Reggel*, 114 U. S. 642, 652 (1885).

of that person's culpable connection with the State.[7] Thus, to be a fugitive from justice it is necessary "that having within a State committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offence, he has left its jurisdiction and is found within the territory of another." *Roberts* v. *Reilly*, 116 U. S., at 97 (emphasis added). "For all that is necessary to convert a criminal under the laws of a State into a fugitive from justice is that he should have left the State after having incurred guilt there." *Strassheim* v. *Daily*, 221 U. S. 280, 285 (1911) (citing *Roberts* v. *Reilly, supra*). See also *Appleyard* v. *Massachusetts*, 203 U. S. 222, 227 (1906).

Despite this seemingly sweeping language, we have previously rejected the claim that a person could be considered a fugitive if he could establish that he was outside of the demanding State at the time of the alleged offense, even if "constructive presence" would be a sufficient basis for criminal liability. In *Munsey* v. *Clough*, we wrote:

> "When it is conceded, or when it is so conclusively proved, that no question can be made that the person was not within the demanding State when the crime is said to have been committed, and his arrest is sought on the ground only of a constructive presence at that time, in the demanding State, then the court will discharge the defendant. *Hyatt* v. *Corkran*, 188 U. S. 691 [(1903)], affirming the judgment of the New York Court of Appeals, 172 N. Y. 176 [1902]." 196 U. S., at 374–375.

See also *South Carolina* v. *Bailey*, 289 U. S. 412, 421–422 (1933); *McNichols* v. *Pease*, 207 U. S., at 109–110 (1907); *Ex parte Reggel*, 114 U. S., at 651.

---

[7] In the context of extradition—a form of recognition of sister-state indictments—no less than in the context of recognition of judgments or of laws, "[s]tate boundaries are neither irrelevancies nor licenses to disengage." Brilmayer, Credit Due Judgments and Credit Due Laws: The Respective Roles of Due Process and Full Faith and Credit in the Interstate Context, 70 Iowa L. Rev. 95, 112 (1984).

Similarly, I believe that we should today reject the notion that a parent who holds custody as determined by the Parental Kidnaping Prevention Act of 1980, 28 U. S. C. § 1738A, must be extradited as a charged kidnaper. Three reasons compel this conclusion. First, when the fleeing parent lacks child custody under federal law, it is proper to subject him or her to extradition in order to face criminal prosecution. But when the parent acts consistently with the federal law that governs interstate custody disputes, he should not be deemed to have fled from the judicial process of the demanding State. By allowing the custodial parent under federal law to be branded as a fugitive, the Court implicitly approves nonadherence to the uniform federal rule governing custody determinations.

Second, requiring the extradition of Richard Smolin is at cross-purposes with Congress' intent to "discourage continuing interstate controversies over child custody" and to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards." See 28 U. S. C. § 1738A note.[8] Compelling extradition to face a criminal charge which cannot lead to a conviction, no less than "child snatching," is the coerced transportation of a party to a custodial dispute to another forum in order to serve a private interest. · It is anomalous that the Act, which

---

[8] A uniform rule establishing which parent has custody deters "child snatching." See Field, Sources of Law: The Scope of Federal Common Law, 99 Harv. L. Rev. 881, 959, n. 340 (1986). The Parental Kidnaping Prevention Act achieves a uniform rule in practice by establishing the circumstances under which a State may render or modify a child custody determination and requiring that other States give full faith and credit to judgments that conform to these standards. See 28 U. S. C. §§ 1738A(a), (c)–(g). If States were free not to give full faith and credit to the custody judgments of other States, a forum-shopping parent would have an incentive to remove the child to a State which was more likely to render a custodial decree in favor of that parent. See Brilmayer, *supra*, at 103.

was clearly intended to deter the former type of coercion, should not also be interpreted to discourage the latter.[9]

Third, the Extradition Clause should be construed consistently with the Parental Kidnaping Prevention Act because both are expressions of the constitutional command of full faith and credit that governs relations among the several States. The Extradition Clause "articulated, in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art. IV." *Michigan* v. *Doran,* 439 U. S., at 287–288. The courts of every State best adhere to this principle, when considering an extradition request for alleged parental kidnaping, by giving full faith and credit to custody judgments rendered by other States as commanded by the Act. It is clear to a court performing this task that the Smolins are not fugitives within the meaning of the extradition request; as the custodial parent under the federal statute, Richard Smolin did not commit while in Louisiana "an act which by the law of the State constitutes a crime." *Hogan* v. *O'Neill,* 255 U. S. 52, 56 (1921).

---

[9] Of course, persons who remove a child from a State in violation of the Parental Kidnaping Prevention Act should be brought to justice. Indeed, Congress has explicitly pointed out that the Fugitive Felon Act, 18 U. S. C. § 1073, which makes it a federal crime for a person to move or travel "in interstate or foreign commerce with intent . . . to avoid prosecution . . . under the laws of the place from which he flees, for a crime . . . which is a felony under the laws of the place from which the fugitive flees" applies to parental kidnaping. 28 U. S. C. § 1738A note. The Act also makes available, in certain limited instances, the assistance of the Federal Bureau of Investigation in apprehending interstate abductors. See generally Donigan, Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction, 19 Gonz. L. Rev. 1, 64–66 (1983–1984) (Department of Justice does not interpret Act to require routine federal involvement in parental abductions). Congress' assertions of the federal interest in regulating parental abduction require habeas courts to exercise particular vigilance that a custodial parent not be extradited as a fugitive from justice.

## III

The Court is scrupulously fair in its recital of the facts and frank in its acknowledgment that the criminal process may have been abused in this case. The reasoning the Court follows nevertheless adopts an overly restrictive view of the questions that the habeas courts of a rendering State must pose. The law governing interstate rendition for criminal proceedings does not foreclose a summary inquiry into whether the crime charged is legally impossible. Moreover, in an area in which Congress has seen fit to enact nationwide legislation, I cannot agree that respect for the criminal laws of other States requires the State of California indiscriminately to render as fugitives those citizens who are conclusorily charged with simple kidnaping for their exercise of a right conferred upon them by a valid custody decree issued by a California court. The Court's contrary conclusion will, I fear, produce unnecessary inconvenience and injustice in this case and provide estranged parents with an inappropriate weapon to use against each other as they wage custody disputes throughout this land.

I respectfully dissent.