Matthew A. MORRISON, Plaintiff,

v.

John STEPANSKI, et al., Defendants.

No. 3: CV–92–1477.

United States District Court,
M.D. Pennsylvania.

Dec. 3, 1993.

Marc I. Woltag, Embser & Woltag, Wellsville, NY, for plaintiff.

Michael L. Harvey, Office of Atty. Gen., Harrisburg, PA, for defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Plaintiff Matthew A. Morrison alleges in this civil rights action[1] that Pennsylvania State Police Troopers John P. Stepanski[2] and Charles Daniel Counts violated his civil rights by surrendering him to the New York State Police on November 16, 1990 without going through proper extradition channels in violation of his rights under the Uniform Criminal Extradition Act, as adopted in Pennsylvania (PaUCEA or the Act),[3] Article IV, Section 2, Clause 2 of the United States Constitution, the Federal Extradition Statute, 18 U.S.C. § 3182; and the Fourth, Sixth and Fourteenth Amendments to the United States Constitution.

Morrison's arrest by Troopers Stepanski and Counts stemmed from an advisory to the Pennsylvania and New York State Police which went out in the early morning hours of November 16, 1990. Morrison was wanted by the New York State Police in connection with an incident which took place a few hours earlier at the home of James Doan in Alma Township, Allegany County, New York. Morrison entered the Doan home with a Deerslayer 12-gauge shotgun, and upon finding his live-in girl friend, Rhonda Ordiway, in bed with Doan, discharged the gun at a wall inside the residence and again outside the residence in the general direction of the dwelling.

---

1. 42 U.S.C. § 1983.

2. Trooper Stepanski has since been promoted to the rank of Corporal. We will refer to him as Trooper Stepanski in this memorandum, since that was his rank at the time of the incident.

Trooper Stepanski's name is sometimes spelled "Stepansky" in pleadings and other documents filed by the parties. Stepanski is the spelling used in the original pleading, and is the spelling we will use in this memorandum.

3. 42 Pa.Cons.Stat.Ann. §§ 9121–9144.

After leaving the Doan residence, Morrison returned to his trailer, made several telephone calls, and then left·on foot with the intention of hitchhiking to Florida. Morrison knew that the New York State Police would be looking for him because of the incident at the Doan residence and wanted to get out of the state.

The New York State Police issued a bulletin describing Morrison as armed and a possible danger to himself and others. Due to Allegany County's proximity to Pennsylvania, that warning was circulated to the Pennsylvania State Police. Troopers Counts and Stepanski sighted Morrison walking along a Pennsylvania highway, ordered him to halt, took him into custody, and placed him in the rear of their squad car. Troopers Counts and Stepanski testified at trial that, when asked about extradition, plaintiff stated that he wanted to return to New York and "get things over with", a statement they interpreted as a willingness to waive extradition.

Plaintiff alleges that defendants' conduct unlawfully deprived him of the right to counsel, the right to petition for writ of habeas corpus to challenge his arrest, and the right to extradition proceedings. He asserts claims under Article IV, Section 2, Clause 2 of the United States Constitution,[4] as implemented by 18 U.S.C. § 3182[5] (the Federal Extradition Statute); under the Fourth, Sixth and Fourteenth Amendments to the United States Constitution; and under the Pennsylvania Extradition Act.

A non-jury trial was held October 7, 1993. Based upon the evidence submitted at trial, the court finds: 1) that Morrison did not waive extradition under the PaUCEA; 2) Morrison was deprived of his federal right to petition for writ of habeas corpus before extradition to New York State; 3) Troopers Counts and Stepanski violated clearly established federal statutory and constitutional rights of which a reasonable person would have known in transferring Morrison to the custody of New York law enforcement authorities; 4) defendants are not entitled to qualified immunity from civil damages; 5) plaintiff did not sustain any actual harm as a legal result of defendants' conduct and is not entitled ·to compensatory damages; and 6) plaintiff is entitled to recover nominal damages for the deprivation of his federal right to petition for habeas relief. We will, therefore, enter judgment in favor of plaintiff and against defendants in the nominal amount of $1.00.

### Findings of fact

The court makes the following findings of fact based on the testimony and exhibits presented at trial:

1. Plaintiff was born on April 7, 1962 and was twenty-eight years of age at the time of the incident.

2. He is the father of three children, two of whom reside with their mother, Rhonda Ordiway.

3. Plaintiff left school in the tenth grade.

4. On November 15, 1990, Morrison resided with his girlfriend, Ronda Ordiway, and their two children in a trailer in Shongo, New York.

4. Article IV, Section 2, Clause 2 provides:
A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.
U.S. CONST. art. IV, § 2, cl. 2.

5. Section 3182 provides:
Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory,

charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.
18 U.S.C. § 3182.

5. On the morning of November 15, 1990, a Thursday, Morrison arose at approximately 4:00 A.M. and went to his job with a roofing contractor.

6. Morrison arrived home from work at approximately 5:30 P.M. and went to the hospital to visit his two-month-old daughter who was ill with a respiratory infection.

7. After visiting his daughter, he returned home and became troubled because Ordiway and his other daughter were not at the trailer, and there was no indication as to where they had gone. He made several phone calls to Ordiway's relatives, but no one was able to tell him where Ordiway and his daughter were.

8. At approximately 8:00 P.M., Morrison left the trailer and went to the Hitching Post Tavern in Shongo, New York, where he drank two or three beers, and smoked one or two marijuana cigarettes.

9. He arrived back home at approximately 2:30 or 3:00 A.M. Ordiway was still not there, and there was still no indication as to where she or their daughter had gone.

10. Morrison telephoned Ordiway's sister, who told him that she had no idea where Ordiway was.

11. Morrison suspected that Ordiway was at the home of an acquaintance named James Doan, and went to the Doan residence.

12. He arrived there at approximately 3:00 A.M. and entered the home through a closed, unlocked, door carrying a Deerslayer 12-gauge shotgun.

13. Morrison went to the second floor of the residence, where he found Ordiway and Doan in bed together.

14. He discharged the gun into an interior wall of the house.

15. He discharged the gun a second time outside the house into an exterior wall.

16. No one was injured in the incident.

17. Morrison returned to his trailer at approximately 4:00 or 4:30 A.M., telephoned his mother and told her that he was contemplating suicide.

18. He then telephoned his employer and told him that he would not be at work that day due to a domestic disturbance.

19. At this point, Morrison was severely distraught, hurt and angry.

20. By this time he had been without sleep for twenty-four hours.

21. He had been treated several years earlier for depression, drug and alcohol abuse.

22. Morrison knew that the New York State Police would be looking for him and left the trailer on foot at approximately 6:00 or 7:00 A.M. with the intention of hitchhiking to Florida, where he had resided several years earlier. He took the rifle with him, intending to leave it at the home of a female acquaintance in Ellisburg, Pennsylvania on his way to Florida.

23. He headed toward the New York/Pennsylvania border and crossed the border into Pennsylvania.

24. The New York State Police were notified of the incident at the Doan resident and issued a bulletin advising troopers to be on the lookout for Morrison.

25. The bulletin stated: "Subject during domestic situation at third party's house fired several shots from 12 ga. shotgun—subject last seen wearing blue baseball cap—blue denim winter jacket—blue work uniforms shirt and pants with logo general roofing on shirt—subject a danger to himself and others."

26. The New York State Police bulletin on Morrison was circulated to the Pennsylvania State Police.

27. The bulletin was received at the Coudersport, Pennsylvania State Police station over its teletype machine in the early morning hours of November 16, 1990 and was circulated to its troopers on patrol.

28. Pennsylvania State Police Troopers John P. Stepanski and Charles Daniel Counts searched for Morrison.

29. Initially, Troopers Counts and Stepanski searched individually in separate patrol cars, but subsequently joined forces and began searching for Morrison together.

30. They spotted him walking along a Pennsylvania highway approximately one to two miles from the Pennsylvania/New York border. Troopers Counts and Stepanski drew their weapons and ordered him to halt, and lie facedown on the pavement.

31. Morrison complied, was taken into custody and placed in the rear of the patrol car.

32. When asked who he was, Morrison identified himself as Matthew Allen Morrison.

33. The troopers read Morrison his *Miranda* rights.

34. Trooper Counts asked Morrison whether he wanted to return to New York. At first, Morrison replied in the negative, stating that he wanted to fight extradition. He later stated that he wanted to return to New York to get things over with.

35. At the time that statement was made, Morrison had been without sleep for more than twenty-four hours, was under extreme stress due to the series of events which had taken place over the previous twenty-four hours, including the illness of his infant daughter, the extended absence of his girlfriend and their minor child from their home, his inability to ascertain their whereabouts, and the incident at the Doan residence.

36. Morrison had a history of depression and alcohol and drug abuse and had, within the previous twenty-four hours, imbibed alcohol and marijuana.

37. Troopers Stepanski and Counts interpreted Morrison's second statement as a willingness to waive extradition and conveyed that message to the New York police.

38. Arrangements were made for Troopers Stepanski and Counts to transfer Morrison to the custody of the New York State Police.

39. The transfer point agreed upon was the Hitching Post Tavern in Shongo, New York.

40. Troopers Stepanski and Counts arrived at the designated location at approximately 11:40 A.M. on November 16, 1990 with Morrison, and custody of him was transferred to the New York State Police.

41. Morrison was asked by the New York State Police whether he was returning to the state voluntarily and he replied in the affirmative.

42. At no time did Morrison sign a written waiver of extradition rights or have his extradition rights explained to him.

43. Morrison told the New York State Police that he was experiencing chest pains and difficulty breathing and was taken to a nearby hospital for evaluation. He was released several hours later into the custody of the New York State Police.

44. Criminal charges were filed against Morrison in New York State.

45. Morrison appeared before the Honorable Peter R. Sprague in County Court for the County of Allegany, New York on January 16, 1991, with counsel, Jerry Fowler, Esq., and entered a plea of guilty to burglary in the third degree.

46. On February 28, 1991, Morrison was sentenced to an indeterminate term of imprisonment with a maximum term of four years and a minimum term of one and ⅓ years, and waived his right of appeal.

47. Morrison served two years in prison and was released in March, 1993.

### Conclusions of law

Based upon the evidence presented and the findings of fact, we reach the following conclusions of law:

1. This court has jurisdiction over plaintiff's claims under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.

2. Under Article IV, Section 2, Clause 2 of the United States Constitution, states have a constitutionally-imposed duty to extradite persons who "flee from Justice" in another state.

3. That duty is implemented by the Federal Extradition Act, 18 U.S.C. § 3182.

4. Procedures for carrying out that duty are governed in Pennsylvania by the Uniform Criminal Extradition Act, codified at 42 Pa. Cons.Stat.Ann. §§ 9121–9144.

5. Alleged fugitives have a federal right to challenge extradition from the asylum state by petitioning for habeas relief.

6. The PaUCEA provides for formal extradition proceedings. 42 Pa.Cons.Stat.Ann. § 9126–9131.

7. It also provides for both formal and informal waiver of the right to such proceedings. 42 Pa.Cons.Stat.Ann. § 9146.

8. Although informal waiver is expressly sanctioned by section 9146(c), procedural safeguards nevertheless attach.

■ 9. To establish a valid waiver, there must be a showing that: 1) an unequivocal statement was made by the alleged fugitive evidencing his intent to waive extradition proceedings and return to the demanding state; 2) the statement was made voluntarily, i.e. was an exercise of free-will and rational thought with at least a rudimentary understanding of the rights being surrendered.

10. Morrison's statement to Troopers Counts and Stepanski on the morning of November 16, 1990 that he wanted to "get things over with" was not sufficiently unequivocal to signify his intent to waive extradition proceedings.

11. Due to the events of the preceding twenty-four hours, Morrison's statement was not voluntary.

12. Morrison did not waive extradition rights under the PaUCEA.

13. Morrison was deprived of his federal right to petition for writ of habeas corpus before extradition to New York.

14. Defendants' conduct was the legal cause of that harm.

15. Troopers Counts and Stepanski violated clearly established federal statutory and constitutional rights of which a reasonable police officer would have known in transferring Morrison to the custody of New York law enforcement authorities.

16. Defendants are not immune from civil damages for harm sustained by plaintiff as a legal result of their conduct.

17. Plaintiff sustained no actual harm as a legal result of defendants' conduct.

18. Plaintiff is not entitled to compensatory damages.

19. Plaintiff is entitled to nominal damages for the deprivation of his federally-protected right to petition for writ of habeas corpus.

20. Plaintiff will be awarded $1.00 as nominal damages.

## DISCUSSION

### *Plaintiff's section 1983 claim*

■ To prevail on a section 1983 claim, a plaintiff must establish that: 1) the conduct complained of was done by a person acting under color of state law; and 2) that such conduct deprived the plaintiff of rights, privileges, or immunities secured by the United States Constitution or the laws of the United States. *Crumley v. Snead*, 620 F.2d 481, 483 (5th Cir.1980) and 42 U.S.C. § 1983.

■ A fugitive threatened with extradition has a federal right to challenge extradition by petitioning for a writ of habeas corpus in the asylum state. *Bradley v. Extradition Corporation of America*, 758 F.Supp. 1153, 1157 (W.D.La.1991), citing *Roberts v. Reilly*, 116 U.S. 80, 94, 6 S.Ct. 291, 299, 29 L.Ed. 544 (1885). Denial of that right gives rise to a cause of action under section 1983.[6] *Good v. Allain*, 823 F.2d 64, 67 (5th Cir.1987) and *Crumley, supra*, 620 F.2d at 483.

Morrison clearly has a right to recover under section 1983 if he was denied his federal right to petition for a writ of habeas corpus. The first element necessary to effect recovery under section 1983 is not in contention, i.e., Troopers Counts and Stepanski do

---

**6.** The courts which have refused to recognize such a right are in the minority and have generally based their refusal to recognize a cause of action on the ground that extradition statutes were adopted by the states to facilitate the apprehension and transfer of fugitives, not to safeguard the rights of such persons. See, e.g., *Raffone v. Sullivan*, 436 F.Supp. 939, 941 (D.Conn. 1977) (statutory extradition rights derive from state, not federal, law, such that no cause of action arises under section 1983 for their violation); *remanded mem.*, 595 F.2d 1209 (2d Cir. 1979) (recognizing that conduct which shocks the conscience gives rise to a due process violation) and *Giano v. Martino*, 673 F.Supp. 92, 95 (E.D.N.Y.1987).

not deny that they were acting under color of state law. What is in contention is whether a federal right was violated.

Defendants contend that Morrison waived his right to extradition and therefore suffered no deprivation of rights as a result of their conduct.

### Extradition proceedings

As an alleged fugitive in the custody of the Pennsylvania State Police, Morrison had a right to the procedures guaranteed by the Pennsylvania UCEA. Under the PaUCEA, extradition proceedings begin with the issuance of a request from law enforcement authorities in the demanding state to the governor of that state requesting issuance of a warrant directed to the governor of the asylum state. When the warrant issues, the governor of the asylum state (Pennsylvania) responds by, in turn, issuing a governor's warrant directing law enforcement authorities of the asylum to make arrangements for the alleged fugitives' return to the demanding state. 42 Pa.Cons.Stat. §§ 9128 and 9129.

At some point during this process, the fugitive has the right to appear before a judge who will explain to him that a demand has been made by another state, inform him of the charges against him in that state, advise him of his right to counsel and of his right to petition for writ of habeas corpus to challenge extradition. 42 Pa.Cons.Stat.Ann. § 9131.[7]

These rights may be waived by execution of a written waiver before the court, in which the alleged fugitive acknowledges his consent to return to the demanding state to face the charges against him. Stringent requirements attach to the procedure for executing such a waiver; section 9146(a) provides in relevant part:

> **(a) General rule.**—Any person arrested in this Commonwealth charged with having committed any crime in another state or alleged to have escaped from confinement or broken the terms of his bail, probation or parole may waive the issuance and service of the warrant provided for in section 9128 ... and section 9129 ... and all other procedure incidental to extradition proceedings by executing or subscribing in the presence of a judge of any court of record within this Commonwealth a writing which states that he consents to return to the demanding state. Before such waiver shall be executed or subscribed by such person it shall be the duty of such judge to inform such person of his rights to the issuance and service of a warrant of extradition and to obtain a writ of habeas corpus, as provided in section 9131 ....

42 Pa.Cons.Stat.Ann. § 9146(a). If written consent to the transfer is given pursuant to section 9146(a), the transfer follows as a matter of course with no necessity for any further proceedings.[8]

More pertinent to the case before us, section 9146 also provides for an informal waiver of the right to extradition. Paragraph (c) provides, in relevant part:

> Nothing in this section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state, nor shall this waiver procedure be deemed to be an exclusive

---

**7.** Section 9131 provides, in relevant part:

> No person arrested upon such warrant [a reference to the warrant of arrest authorized by 42 Pa.Cons.Stat.Ann. § 9128] shall be delivered over to the agent whom the executive authority demanding him shall have appointed to receive him unless he shall first be taken forthwith before a judge of a court of record in this Commonwealth who shall inform him of the demand made for his surrender and of the crime with which he is charged and that he has the right to demand and procure legal counsel, and, if the prisoner or his counsel shall state that he or they desire to test the legality of his arrest, the judge of such court of record shall fix a reasonable time to be al-

lowed him within which to apply for a writ of habeas corpus....

42 Pa.Cons.Stat.Ann. § 9131.

**8.** Section 9146(b) provides, in relevant:

> **(b) Action following waiver.**—If and when such consent has been duly executed it shall forthwith be forwarded to the office of the Governor of this Commonwealth and filed therein. The judge shall direct the officer having such person in custody to deliver forthwith such person to the duly accredited agent or agents of the demanding state, and shall deliver or cause to be delivered to such agent or agents a copy of such consent.

42 Pa.Cons.Stat.Ann. § 9146(b).

procedure or to limit the powers, rights or duties of the officers of the demanding state or of this Commonwealth.

42 Pa.Cons.Stat.Ann. § 9146(c).

▮ The question before us is what protections attach to an informal waiver under section 9146(c) and whether those conditions were met here. This issue has been addressed by the federal courts[9] only infrequently.

The United States Supreme Court and the Third Circuit Court of Appeals have yet to rule on this issue. Among the courts which have ruled on it, the requirement that the waiver be knowing and voluntary is universal.[10] At least one court has added the stipulation that it must also be evidenced by an unequivocal statement of the alleged fugitive indicating his intent to waive extradition.

Many courts which have considered the issue have noted the standard for the waiver only in passing or without explanation for the standard adopted. One of the few cases to discuss the issues at some length was *McBride v. Soos*, 512 F.Supp. 1207, 1215 (N.D.Ind.1981), *result aff'd on appeal,* 679 F.2d 1223 (7th Cir.1982). In a section 1983 action against two members of the Elkhart County, Indiana Sheriff's Department, McBride alleged that his rights under the Missouri version of the UCEA were violated when he was extradited from Missouri to Indiana to face murder charges there.

Formal extradition procedures were followed. A warrant for plaintiff's arrest was issued December 6, 1974 by an Elkhart County Justice of the Peace. That same day, plaintiff was arrested and jailed in Clayton County, Missouri based on the Indiana warrant. On January 7, 1975, the Governor of Indiana issued a requisition authorizing the demand for plaintiff's return to Elkhart County. The Governor of Missouri issued a Governor's Warrant on January 16, 1975 ordering McBride's extradition to Indiana. Eight days later, the Elkhart County Court received word from Missouri that McBride had waived extradition proceedings and sent two deputy sheriffs from the Elkhart County Sheriff's Department to pick up the plaintiff in Missouri and bring him back to Indiana. The deputies were told that McBride had waived extradition and that all necessary paperwork was in order. When the deputies arrived in Missouri, Missouri authorities relayed the same message: McBride had agreed to waive extradition. They picked up McBride and took him back to Indiana, where he was tried and convicted on a charge of first degree murder.

McBride alleged in his section 1983 action that he had never waived extradition and sought compensatory damages from the two Elkhart County deputies who transported him back to Indiana. The District Court for the Northern District of Indiana found the deputies liable for violating McBride's rights under the Act, stating, *inter alia,* that they

---

**9.** Plaintiff's right to maintain a section 1983 action emanates from the alleged violation of federal constitutional or statutory rights, not from the alleged violation of state law. The waiver issue is, therefore, governed by federal law. Because the issue before the court is a question of federal law, we look primarily to federal, not state, court decisions to resolve it.

**10.** This requirement contrasts with the lesser showing required to demonstrate a waiver of rights under the Interstate Agreement on Detainers (IAD).

Most courts have rejected the contention that a waiver of rights under the IAD must be knowing, intelligent and voluntary to be upheld. The rationale generally stated is that that requirement applies only to the waiver of constitutional rights essential to preserve the defendant's right to a fair trial and not to the procedural protections granted by the IAD—the primary purpose of which is to facilitate a defendant's rehabilitation in prison by avoiding multiple disruptions caused when charges are outstanding against defendant in another jurisdiction. See, e.g., *Webb v. Keohane,* 804 F.2d 413, 414–15 (7th Cir.1986); *Brown v. Wolff,* 706 F.2d 902, 907 (9th Cir.1983); *People v. McClendon,* 224 Cal.App.3d 1208, 274 Cal.Rptr. 502, 506 (1990); and *Drescher v. Superior Court of the State of California,* 218 Cal. App.3d 1140, 267 Cal.Rptr. 661 (1990).

In this context, most courts have held that voluntariness requires no more than a showing of conduct by the defendant or his attorney inconsistent with the preservation of such rights. *Drescher, supra,* 267 Cal.Rptr. at 666.

The standard differs from that required for the waiver of extradition rights under the UCEA because the waiver of extradition rights entails giving up the right to petition for habeas relief, a federally-guaranteed right. The rights surrendered by a waiver under the IAD include no such federally-guaranteed right.

had a duty to confirm that "McBride voluntarily, intelligently and knowingly waived ... protections" under the Act. *McBride, supra,* 512 F.Supp. at 1211. The Missouri version of the UCEA, like the Pennsylvania version, contained a provision which permitted informal waiver of extradition rights.

The court found that defendants had failed to make "an affirmative showing of a waiver, express or implied", stating that there was no evidence in the record of any statement by McBride relating to extradition. *Id.* at 1212. The only evidence offered to establish such a waiver was defendants' testimony that McBride stated to them before leaving Missouri, that he was "prepared to return to Indiana and get matters straightened out." The court found this statement insufficient to establish a waiver, stating: "A desire to return to Indiana and resolve the outstanding charges does not mean that McBride also waived his procedural protections." *Id.* at 1212–13. "This statement", the court held, did not "represent 'an intentional relinquishment or abandonment' of rights in an extradition proceeding." *Id.* at 1212.

While the court decided that it need not determine whether an "oral and implied" waiver "falls within the scope and meaning" of the Missouri UCEA, since there was no waiver of any kind, the court's discussion included an analysis of what is required to effect a waiver. Applying the standards applicable to the waiver of constitutional rights in other contexts, such as the Sixth Amendment right to counsel (See: *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962)), the entry of a guilty plea (See: *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1711–13, 23 L.Ed.2d 274 (1969)), and *Miranda* rights (See: *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)), the court looked for some evidence that McBride's extradition rights had been explained to him, stating

that although McBride "was aware of some of ... [statutory extradition] protections, "he was not aware of all" of them and was not "fully aware" of their nature. *Id.* at 1213. "Absent such awareness, no waiver is valid." *Id.* McBride's silence, the court held, could not operate as a valid waiver. Failure to object is not equivalent to "an affirmative waiver" of rights. *Id.*

The Indiana District Court identified three elements essential to establish a valid waiver: 1) an unequivocal statement by the alleged fugitive of his intent to waive extradition rights; 2) made voluntarily; and 3) with some rudimentary understanding of the rights being relinquished. *Id.*[11]

The Pennsylvania Supreme Court takes the same view. In *Commonwealth v. Green,* 525 Pa. 424, 581 A.2d 544 (1990) (applying the New Jersey version of the UCEA), the Pennsylvania Supreme Court upheld appellant's written waiver of extradition in the face of challenges to its validity based on the alleged failure of the authorities in the asylum state to advise him of his extradition rights and to take him before a judge or magistrate to sign the waiver. After reviewing applicable federal and state court federal precedent, the Court concluded that: "[S]o long as the waiver is explained to defendant and his consent is not coerced, the waiver is valid." *Id.* at 556. The Court went on to hold that while section 9146(c) plainly sanctions execution of the waiver outside the presence of a judge or magistrate, the waiver must, nevertheless, be "knowing, intelligent and voluntary and non-coercive". *Id.* at 556. The court cited, as authority for that conclusion, the Comment to Section 1–103,[12] stating:

It is generally intended that the standards generally applicable to waivers of constitutional rights in criminal proceedings be applicable to waivers of the right to re-

---

**11.** Although the district court's ruling was reversed on appeal by the Seventh Circuit Court of Appeals, 679 F.2d 1223 (7th Cir.1982), the appellate court did not reach this issue. The Seventh Circuit reversed on the ground that the district court had erred in finding the two Indiana deputies personally responsible for ensuring that McBride had actually waived his extradition rights before taking him back to Indiana to stand

trial. That holding eliminated any need to consider the standard of waiver applicable under the UCEA.

**12.** We presume this to be a reference to section 1–103 of the uniform act, but cannot be certain from the text of the opinion.

quire a judicial hearing under this Section. The waiver must be 'made voluntarily, knowingly, and intelligently.'

*Id.* at 557.

The District Court for the Eastern District of Pennsylvania endorsed the requirement that a waiver be made knowingly in *United States v. Pennsylvania State Police* (Penna. State Police), 548 F.Supp. 9, 15 (E.D.Pa. 1982). Although the waiver issue was not directly before the court, it noted in passing that a fugitive extradited from Delaware to Pennsylvania had the right to waive rights granted by the PaUCEA "in writing but only after they had been fully explained to him under the Delaware version of the Act."[13]

The Eighth Circuit inferred, in *Pierson v. Grant*, 527 F.2d 161 (8th Cir.1975), that some knowledge and understanding of the rights being surrendered is necessary. In upholding a prerelease extradition waiver against plaintiff's challenge that the waiver was invalid because it had been signed as a condition of parole and had not been signed before a judge or magistrate, the court recognized that the waiver had to be voluntary. It held, however, that that requirement had not been breached by requiring the waiver as a condition of parole absent a specific showing that the plaintiff had been coerced. *Id.* at 164. In agreeing with the standard applied by the district court, the Eighth Circuit stated that it was "sufficient if ... [the plaintiff] knew generally that he could require the state to undergo formal procedures to effect his return and chose to give this up". The appellate court held that the waiver was voluntary so long as Pierson "had a general knowledge and understanding of what was involved in the waiver" when he signed it. The court

found he did have such knowledge since he conceded that the waiver was read to him before he signed it and that he basically had a "good idea" of what it meant. *Id.* at 165.

■ Although only a limited number of courts have addressed the issue of waiver of extradition rights, the courts have been unanimous in equating the waiver to the waiver of constitutionally-guaranteed rights and have required such a waiver to be, at minimum, knowing and voluntary. The waiver must be "knowing" in the sense that the alleged fugitive understands that he has certain rights under the UCEA and affirmatively indicates an intention to relinquish those rights. The waiver must be "voluntary" in a general sense, meaning that it was given of the individual's "own accord or by free choice". *The Random House Dictionary* 2131 (2d ed. unabridged 1987). It is with these criteria in mind that we review Morrison's purported waiver of extradition rights.

### Morrison's purported waiver

■ The only evidence proffered by defendants to show a knowing and voluntary waiver on Morrison's part was the testimony of Troopers Counts and Stepanski regarding a statement made by Morrison shortly after his arrest while seated in the back of the squad car. Defendants testified that although Morrison stated at first that he wanted to fight extradition, he recanted that statement a few minutes later, stating that he wanted to return to New York and "get things over with". They interpreted his second statement as a willingness on his part to waive formal extradition proceedings and return to New York voluntarily.

**13.** The relevant provisions of the Delaware statute, 11 Del.Code Ann. § 2526 provide:

Waiver of requisition. Any person arrested or detained for the commission of a crime in a foreign jurisdiction, may, after his rights to demand requisition papers have been fully explained to him, waive requisition and consent to return to the jurisdiction in which he is wanted. The waiver of requisition shall be in writing, and shall set forth that he voluntarily waives requisition and that his rights have been fully explained to and understood by him, which shall be signed by the prisoner and 3 other witnesses in his presence. The proper

signing of such a waiver of requisition shall constitute ample authority for the sheriff, or other officer having the prisoner in custody, to deliver the prisoner to the duly authorized agent commissioned to receive him. The sheriff, or other officer having the prisoner in charge, before he surrenders the prisoner shall be satisfied that the agent is duly authorized and commissioned to receive the prisoner, and shall, unless the agent is a known peace officer, demand and retain the agent's warrant of authority, which he shall file and preserve together with the prisoner's waiver of requisition.

Morrison's statement that he wanted to "get things over with" was not sufficiently unequivocal to signify a willingness to waive extradition rights. In *McBride, supra,* the Indiana District Court rejected the argument that a similar statement by the plaintiff in that case could constitute a waiver. McBride told the Indiana deputies who went to transport him back to Indiana that he was "prepared to return to Indiana and get matters straightened out." The court found this insufficient to establish a waiver, stating: "A desire to return to Indiana and resolve the outstanding charges does not mean that McBride also waived his procedural protections." *Id.* at 1212–13. "This statement", the court held, did not "represent 'an intentional relinquishment or abandonment' of rights in an extradition proceeding." *Id.* at 1212.

The same can be said of Morrison's statement to Troopers Counts and Stepanski. His desire to "get things over with" cannot be equated to an indication of intent to waive extradition rights, particularly in light of the statement made a few minutes earlier that he wanted to fight extradition.

Not only was plaintiff's statement equivocal, it was made under circumstances which make its voluntary nature highly questionable. Morrison had been without sleep for more than twenty-four hours prior to his arrest. He had also been under tremendous stress due to a series of events and crises, some of his own making, some not. He had also consumed both alcohol and drugs during the previous twenty-four hours and had a history of problems with alcohol and drug abuse.

All of these conditions combined to make any statement he made under such circumstances the antithesis of a voluntary relinquishment of known rights. In light of the circumstances under which it was made, we do not find Morrison's waiver, if his statement can be considered such, voluntary or knowing. We find, therefore, that his conduct was insufficient to effect a waiver of extradition rights under the PaUCEA. The absence of a waiver renders Morrison's return to New York involuntary and in violation of his extradition rights, and in particular, of his federal right to petition for habeas relief.

### Qualified Immunity

Troopers Counts and Stepanski assert that they are entitled to qualified immunity from civil damages under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) and its progeny. In *Harlow, supra,* the United States Supreme Court reformulated the standard for determining qualified immunity,[14] stating:

> [G]overmental officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Whether "clearly established constitutional protections" were violated is a question of law. *Limes–Miller v. City of Chicago,* 773 F.Supp. 1130, 1143 (N.D.Ill. 1991). State actors are not required to "anticipate subsequent legal developments" or to know that "the law forbade conduct not previously identified as unlawful." *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. at 2738.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

"For purposes of determining whether a right is 'clearly established,' the

---

**14.** Prior to the Supreme Court's decision in *Harlow, supra,* the qualified immunity test had two prongs: one objective and one subjective. See, e.g., *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The Court eliminated the subjective or "good faith" component in *Harlow, supra,* out of concern that it embroiled the parties unduly in wide-ranging discovery to determine the state official's motivation. *Harlow, supra,* 457 U.S. at 816–17, 102 S.Ct. at 2737–38.

court must look to the status of the law at the time of the challenged actions." *Burns v. County of Cambria*, 971 F.2d 1015, 1024 (3d Cir.1992). The Third Circuit has adopted "a broad view of what constitutes an established right of which a reasonable person would have known.'" *Stoneking v. Bradford Area School District*, 882 F.2d 720, 726 (3d Cir.1987), quoting *Sourbeer v. Robinson*, 791 F.2d 1094, 1103 (3d Cir.1986), *cert. denied*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987). State actors are required to know and apply general legal principles in appropriate factual settings, *Hicks v. Feeney*, 770 F.2d 375, 379–80 (3d Cir.1985), but not to predict new developments in the law or expand current case law into wholly new areas. This does not mean that there must be "precise factual correspondence" between the case at hand and a previous case, but only that it must be clear that established law would apply to the facts at hand. *Burns, supra*, 971 F.2d at 1024.

 As the proponent of qualified immunity, defendants bear the burden of establishing that it applies to them. *Stoneking, supra*, 882 F.2d at 726. It has long been established that the waiver of constitutional safeguards intended to protect the right of an accused to a fair trial must be knowing, intelligent and voluntary. What is less certain is whether it was clearly established in November, 1990 that those safeguards attached to the waiver of extradition rights. As we discussed above, few decisions have addressed this issue. Those which have, however, have all come done squarely on the side of requiring, at a minimum, a knowing and voluntary waiver.

While we concede that the question is a close one since the application of waiver principles to extradition rights is not an issue widely discussed or debated,[15] the law nevertheless was clear at the time of plaintiff's arrest. We conclude, therefore, that a reasonable individual in defendants' position would have known that more was required to waive extradition rights than an equivocal statement by the alleged fugitive made without any verification that the waiver was either knowing, in even the most rudimentary sense, or voluntary.

### Absence of actual injury

 Actual injury must be shown before a section 1983 plaintiff may recover compensatory damages for the denial of procedural due process. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). See also: *McBride, supra*, 512 F.Supp. at 1214. There must also be a showing that if not for the deprivation of procedural due process rights suffered by the plaintiff, the outcome would have been different. Otherwise, "an award of damages ... would constitute a windfall, rather than compensation." *Carey, supra*, 435 U.S. at 260, 98 S.Ct. at 1050. In the context of extradition rights, other courts have observed that if:

> the alleged fugitive has been subsequently constitutionally convicted in the demanding state, something more than mere noncompliance with the extradition statutes would have to be shown to provide a basis for compensatory damages, since if there is probable cause to arrest that person and try him on charges pending in the demanding state and he is subsequently convicted, there appears to be no basis for damages absent special circumstance or physical harm.

*McBride, supra*, 512 F.Supp. at 1216, citing *Brown, supra*, 619 F.2d at 764.

 The only federal right which plaintiff was denied as a result of defendants' conduct was the right to petition for a writ of habeas corpus. A habeas corpus challenge to extradition proceedings is limited to a few basic issues: 1) whether the extradition documents on their face are in order; 2) whether the petitioner has been charged with a crime in the demanding state; 3) whether the petitioner is the person named in the request for extradition; and 4) whether the petitioner is a fugitive. *California v. Superior Court*, 482 U.S. 400, 408, 107 S.Ct. 2433, 2438–39, 96 L.Ed.2d 332 (1987); *Michigan v.*

---

**15.** Compare: *Ortega v. City of Kansas City*, 659 F.Supp. 1201, 1211 (D.Kansas 1987) (Kansas' enactment of the UCEA would place a "reasonable police chief and [police] officers on notice that using a sting operation to 'lure' or 'entice' a suspect across state lines for the purpose of arresting him would violate the extradition act").

*Doran,* 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978); *Good, supra,* 823 F.2d at 67 and *McBride, supra,* 512 F.Supp. at 1216. As at least one court has observed, these questions are answerable on the basis of "readily verifiable" "historic facts". *McBride, supra,* 512 F.Supp. at 1216. See also: *Penna. State Police, supra,* 548 F.Supp. at 14 (issues for consideration enumerated in a slightly variant form). The reviewing state court may also determine whether there has been a finding of probable cause by a neutral judicial officer. *Doran, supra,* 439 U.S. at 289, 99 S.Ct. at 535 ("[W]hen a neutral judicial officer of the demanding state has determined that probable cause exists, the courts of the asylum state are without power to review the determination.") See also: *United States v. Pennsylvania State Police,* 548 F.Supp. 9 (E.D.Pa. 1982) and *Golden v. Dupnik,* 726 P.2d 1096, 1098 (Ariz.Ct.App.1986).

■ If these requirements are satisfied, the court looks no further and denies the petition. There is no inquiry into the merits of the charges on which extradition is based. *McBride, supra,* 512 F.Supp. at 1216. That is solely a matter for the courts of the demanding state.

■ We can say with certainty that in Morrison's case, the second, third and fourth requirements would unquestionably have been met. The only element about which there can be any question is the first. Extradition documents having never been issued, we cannot say with certainty whether such documents would have been in order. We can only comment that extradition proceedings are routine matters from a procedural standpoint and there is no reason to conclude that extradition papers issued on Morrison would not have been in order or that any error would not have been promptly rectified so that extradition could proceed. See: *California, supra,* 482 U.S. at 407–08, 107 S.Ct. at 2438–39, and *Bradley, supra,* 758 F.Supp. at 1157.

Morrison argues that he should be compensated for emotional harm and anguish caused by the sentence imposed by the New York state courts. That reasoning has been rejected by other courts, (See: *McBride, su-*

*pra,* 512 F.Supp. at 1215.), and is inconsistent with the law. Morrison's entry of a guilty plea was not the result of the violation of his extradition rights. As we discussed above, had the Troopers not taken Morrison to New York on the morning of November 16, 1990, the result would have been a delay in his return to New York to face the charges pending against him. He would, however, ultimately have been returned to New York to face charges for the November 16, 1990 incident at the Doan residence.

Plaintiff speculated at trial that it was his belief that had he remained in Pennsylvania and contested extradition, he could have used that as a bargaining tactic to persuade the District Attorney to reduce the charges he was facing. That does not seem likely to this court in light of the nature of the incident, and since extradition is not a complicated procedure, requiring little effort on the part of the requesting District Attorney.

■ Plaintiff's argument on this issue is also inconsistent with well-established law. Failure of the demanding or the asylum state to comply with the extradition process does not invalidate the conviction or guilty plea ultimately obtained. Once the fugitive has been returned to the demanding state, he has no choice but to face the charges against him; it is no defense that the officials of either state failed to comply with extradition statutes. *McBride,* 512 F.Supp. at 1215. "There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Id.,* citing *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952). See also: *Penna. State Police, supra,* 548 F.Supp. at 13 and *Siegel v. Edwards,* 566 F.2d 958, 960 (5th Cir.1978).

■ Nominal damages are, however, recoverable for violation of the right in the absence of proof of actual harm. *Draper v. Coombs,* 792 F.2d 915, 919–21 (9th Cir.1986); *Crenshaw v. Checchia,* 668 F.Supp. 443, 444 (E.D.Pa.1987); and *McBride, supra,* 512 F.Supp. at 1214. Morrison is, therefore, entitled to nominal damages only under section 1983 for the deprivation of his federally-

**1144**

protected right to petition for a writ of habeas corpus.

### *Summary*

To summarize, we conclude as follows: 1) to be effective the waiver of extradition rights by an alleged fugitive must be, at minimum, unequivocal, knowing and voluntary; 2) plaintiff's statement on the morning of November 16, 1990 to Troopers Counts and Stepanski that he wanted to return to New York to "get things over with" did not operate as a waiver of extradition rights under the PaUCEA; 3) plaintiff was, therefore, unlawfully deprived of his federal right to challenge extradition by petitioning for habeas relief; 4) Troopers Counts and Stepanski are not immune from civil liability for their conduct; 5) plaintiff sustained no actual harm as a result of their conduct and is not, therefore, entitled to compensatory damages; and 6) plaintiff is entitled to recover nominal damages in the amount of $1.00 for the violation of his federally-protected right to petition for writ of habeas corpus.

### ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Judgment is entered in favor of plaintiff Matthew A. Morrison and against defendants John P. Stepanski and Charles Daniels Counts in the sum of $1.00 as nominal damages.

2. If plaintiff wishes to proceed on a demand for counsel fees pursuant to 42 U.S.C. § 1988, he is directed to file a statement of counsel fees and costs incurred in pursuing this action within fourteen days from the date of this order.

3. Plaintiff's statement should include a breakdown indicating the nature of work performed by counsel, the date on which such work was performed, and counsel's hourly rate. It should be accompanied by an affidavit or some form of verification from counsel indicating the average prevailing hourly rate in the locality where counsel practices for representation in cases of this type.

4. Defendant shall have ten days following the serving of plaintiff's statement of counsel fees to file a response contesting the amount sought.

5. If no counter-statement is timely filed, the court will make its ruling accordingly.

6. The clerk is directed to defer entry of final judgment until disposition of the issue of counsel fees and costs.