Julio GIANO, Plaintiff,

v.

Al MARTINO, Homicide Detective, Nassau County Police Department; R. Schlichtig, Lieutenant, Nassau County Police Department, Defendants.

No. 86 CV 0493 (ERK).

United States District Court, E.D. New York.

Feb. 18, 1987.

Julio Giano, pro se.

Edward T. O'Brien, Co. Atty., Nassau County by Michael A. Santo, Deputy Co. Atty., Mineola, N.Y., for defendants.

### MEMORANDUM AND ORDER

KORMAN, District Judge.

Plaintiff waived extradition from Nevada to New York to face a charge of grand larceny. The essence of his "supplemental" or amended pro se complaint, which is filed pursuant to 42 U.S.C. § 1983, is that the defendants deliberately failed to disclose to him, prior to his waiver of extradition, that they intended to charge him with murder upon his return to New York. By so doing, he alleges, they violated, *inter alia,* the Extradition Clause of the Constitution and the Uniform Extradition Act. The defendants move for summary judgment on the ground that the allegations of misconduct in the complaint, even if true, do not state a cause of actin under the Constitution or laws of the United States.

■ The defendants' motion for summary judgment is granted substantially for the reasons set forth in Judge Newman's opinion in *Raffone v. Sullivan,* 436 F.Supp. 939 (D.Conn.1977), remanded without opinion, 595 F.2d 1209 (2d Cir.1979). Judge Newman there held that, while a violation of the Uniform Extradition Act "may give rise to a cause of action for false arrest or false imprisonment in the asylum state, whose laws were breached," such a violation does not normally give rise to a deprivation of rights secured by the Constitution or laws of the United States. 436 F.Supp. at 941.

■ Judge Newman acknowledged the existence of conflicting authority. Just as he did in *Raffone,* I find the reasoning of that authority unpersuasive in light of the language and purpose of the Extradition Clause and the history of the Uniform Extradition Act.[1] Subsequent to Judge Newman's opinion, however, there have been two holdings of the Supreme Court which have some bearing on this issue and which merit some discussion.

In *Michigan v. Doran,* 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978), the Supreme Court held that "[t]he Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed." Specifically, "[t]he purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice from another state and thus 'balkanize' the administration of justice." Accordingly, "the Extradition

---

1. Judge Newman's opinion has been followed in *Sami v. United States,* 617 F.2d 755, 774 (D.C. Cir.1979), and rejected in such cases as *McBride v. Soos,* 594 F.2d 610 (7th Cir.1979), and *Brown v. Nutsch,* 619 F.2d 758 (8th Cir.1980). The conflict between these authorities may be more illusory than real, at least in the circumstances here. Cases which have recognized a cause of action under section 1983 arising out of the extradition process have done so with the caveat that "[w]here the alleged fugitive has been subsequently constitutionally convicted in the demanding state, something more than mere non-compliance with the extradition statutes would have to be shown to provide a basis for compensatory damages, since if there is probable cause to arrest that person and to try him on charges pending in the demanding state and he is subsequently convicted, there appears to be no basis for damages absent special circumstances or physical harm," *Brown v. Nutsch,* 619 F.2d 758, 764 (8th Cir.1980); *McBride v. Soos,* 594 F.2d 610, 613 (7th Cir.1979). Plaintiff here does not allege "special circumstances" or "physical harm."

Clause articulated in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art. IV." 439 U.S. 287–288, 99 S.Ct. at 534–535.

This restatement of the purpose of the Extradition Clause plainly supports "the traditional reading" of that Clause as "confer[ring] no rights on the individual being sought". *Sami v. United States*, 617 F.2d 755, 774 (D.C.Cir.1979). Indeed, in *Doran* the Supreme Court held that the Extradition Clause limits the rights which asylum states may confer on fugitive defendants under the Uniform Extradition Act or otherwise. Specifically, *Doran* held that the courts of the asylum state were precluded from conducting "the kind of preliminary inquiry traditionally intervening between the initial arrest and trial." 439 U.S. at 288, 99 S.Ct. at 535.

■ To be sure, the arrest of a fugitive for the purpose of securing his extradition constitutes a deprivation of his liberty. Accordingly, he may not be seized or held for the period required to effectuate his extradition without probable cause and without a finding of probable cause by way of indictment or by a determination of "a neutral judicial officer of the demanding state." *Michigan v. Doran, supra,* 439 U.S. at 290, 99 S.Ct. at 536. Whether this right derives from the Fourth Amendment, as the concurring justices persuasively argued in *Michigan v. Doran,* or is implied from the Extradition Clause, however, plaintiff was not deprived of it here. Plaintiff does not allege that probable cause was lacking for his arrest for grand larceny (for which a warrant had been issued upon a finding of probable cause) [2] or for the murder charge of which he was ultimately convicted. "Under these circumstances, he

has no claim for damages under the Civil Rights Act." *Raffone v. Sullivan, supra,* 436 F.Supp. at 942.

■ *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), the second and more recent Supreme Court case decided after *Raffone,* does not require a contrary result. There, the Supreme Court held that the Interstate Agreement on Detainers was an interstate compact and hence a law of the United States for the purposes of 42 U.S.C. § 1983. Because the legislative history of the Agreement on Detainers indicated that a prisoner transferred pursuant to the Agreement "should be entitled to whatever 'safeguards of the extradition process' he might otherwise have enjoyed," including the pretransfer "hearing" provided by Section 10 of the Uniform Extradition Act "in those States that have adopted it," 449 U.S. at 448, 101 S.Ct. at 711–12, the failure to award a prisoner such a hearing "stated a claim for relief under 42 U.S.C. § 1983 for the asserted violation by state officers of the terms of the Detainer Agreement." 449 U.S. at 450, 101 S.Ct. at 712.

The present case is distinguishable from *Cuyler* on two grounds. First, there was no violation of the Uniform Extradition Act here. Section 10 of the Act, to which Nevada Revised Statutes § 179.197 corresponds, grants the prisoner a pretranser "hearing" at which he is informed of the demanding state's request for custody, his right to counsel, and his right to apply for a writ of habeas corpus challenging the custody request.[3] It is uncontroverted here that a pretransfer "hearing" was held, and that plaintiff was advised of his rights and (1) admitted that he was "the identical person against whom criminal proceedings charging [him] with the commission of a

---

**2.** The warrant for plaintiff's arrest was issued pursuant to N.Y. Criminal Procedure Law § 120.20(1) which authorizes the issuance of an arrest warrant when the accusatory instrument "is sufficient on its face". The words "sufficient on its face" are defined to mean "provide[s] reasonable cause to believe the defendant committed the offense charged in the accusatory part of such instrument". N.Y. Criminal Procedure Law § 100.40(4)(b).

**3.** At a later habeas corpus hearing the prisoner is permitted to question only "(a) whether the extradition documents on their face are in order; (b) whether [he] has been charged with a crime in the demanding state; (c) whether [he] is the person named in the request for extradition; and (d) whether [he] is a fugitive," *Michigan v. Doran, supra,* 439 U.S. at 289, 99 S.Ct. at 535.

felony, have been instituted in the City of Mineola, State of New York" and (2) "freely, voluntarily and without promise of reward of leniency agree[d] consent[ed] and elect[ed] to return to the said City of Mineola, without requisition papers, warrant of rendition or other legal forms or processes having for their object [his] return...." Santo Aff. Exh. E.

While plaintiff alleges that defendants deliberately failed to disclose their intent to charge him with murder once he was released to their custody and returned to New York, it is doubtful that this failure, even if proved, would constitute a violation of Section 10. Section 26 of the Uniform Extradition Act, aptly titled "No Right of Asylum," expressly provides that a person who has been returned to the demanding state by extradition proceedings may be tried "for other crimes which he may be charged with having committed [t]here, as well as that specified in the requisition for his extradition."[4] The Uniform Extradition Act, however, does not require that any warning be given regarding such other charges before extradition is waived.

The second ground for distinguishing this case from *Cuyler* is the fact that even if there was a violation of the Uniform Extradition Act, the Act, unlike the Detainer Agreement, was not enacted pursuant to an agreement or compact between any of the states. Nor is there any evidence of the kind from which the Supreme Court took comfort in *Cuyler*, 449 U.S. at 441, n. 9, 101 S.Ct. at 708, n. 9, that the Uniform Extradition Act was enacted pursuant to the general congressional authorization of interstate compacts there at issue. 4 U.S.C. § 112(a). Indeed, the Uniform Extradition Act was promulgated by the Conference of Commissioners in Uniform State Laws in 1925 and adopted by approximately ten states prior to the enactment of 4 U.S.C. § 112(a) in 1934. 1936 *Report of the New York Law Revision Commission*, p. 39. Thus, as Judge Newman concluded in *Raffone, supra,* the Uniform Extradition Act is not a law of the United States, and a

violation thereof does not support a claim under 42 U.S.C. § 1983.

▇▇▇ Finally, there is one argument raised by a liberal reading of the complaint here which does not appear to have been raised or considered in *Raffone.* Plaintiff contends that the conduct of the defendant violated the Federal Kidnapping Act, 18 U.S.C. § 1201, and that since this is a law of the United States, the complaint states a cause of action under 42 U.S.C. § 1983.

The difficulty with this argument, assuming the acts of the defendants violated 18 U.S.C. § 1201, is that the Federal Kidnapping Act was never intended to confer rights on the victim of a kidnapping, and does not do so by its language. Instead, it was enacted to assist the states in enforcement of their kidnapping laws by making it impossible for kidnappers to avoid apprehension by moving their victims across state lines. As the Supreme Court explained in *Chatwin v. United States*, 326 U.S. 455, 462–463, 66 S.Ct. 233, 236–237, 90 L.Ed. 198 (1946):

> This statute was drawn in 1932 against a background of organized violence. 75 Cong.Rec. 13282–13304. Kidnaping by that time had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect themselves.
>
> Victims were selected from among the wealthy with great care and study. Details of the seizures and detentions were fully and meticulously worked out in advance. Ransom was the usual motive. "Law enforcement authorities, lacking coordination, with no uniform system of intercommunication and restricted in authority to activities in their own jurisdiction, found themselves laughed at by criminals bound by no such inhibitions or restrictions * * * The procedure was simple—a man would be kidnapped in one state and whisked into another, and still another, his captors knowing full

4. N.Y. Criminal Procedure Law § 570.60 and Nevada Revised Statutes § 179.233 correspond to Section 26 of the Uniform Extradition Act.

well that the police in the jurisdiction where the crime was committed had no authority as far as the State of confinement and concealment was concerned...."

It was to assist the states in stamping out this growing and sinister menace of kidnaping that the Federal Kidnapping Act was designed. Its proponents recognized that where victims were transported across state lines only the federal government had the power to disregard such barriers in pursuing the captors. H.Rep. No. 1493 (72d Cong., 1st Sess.); S.Rep. No. 765 (72d Cong., 1st Sess.).

Accordingly, because the acts alleged in the complaint did not deprive plaintiff of "any rights, privileges or immunities secured by the Constitution and laws" of the United States, 42 U.S.C. § 1983, defendants' motion for summary judgment is granted.