Anthony W. BARTON, Plaintiff–
Appellant,

v.

Mark NORROD and Randy Pack,
Individually, Defendants–
Appellees.

No. 95–5976.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 30, 1996.

Decided Feb. 13, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied March 31, 1997.

Joseph Howell Johnston (argued and briefed), Nashville, TN, J. Patrick Kilgore (briefed), Lewis, King, Krieg, Waldrop & Catron, Bowling Green, KY, for plaintiff–appellant.

Hal D. Hardin (argued), Nashville, TN, Henry B. Brennenstuhl (briefed), Campbell, Kerrick & Grise, Bowling Green, KY, for defendants–appellees.

Before: BOGGS and SILER, Circuit Judges, and McCALLA, District Judge.*

* The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennes- see, sitting by designation.

BOGGS, Circuit Judge.

Plaintiff Anthony Barton appeals the district court's order that defendant Mark Norrod is entitled to qualified immunity on Barton's § 1983 claim that his constitutional rights were violated when he was transported from Kentucky to Tennessee without formal extradition procedures. He also appeals the court's order granting defendant Randy Pack's motion for directed verdict. We affirm both district court orders. This court's previous decision in *Stockwell v. Friberg*, 272 F.2d 386 (6th Cir.1959), entitles Norrod to qualified immunity. Additionally, Pack was entitled to a directed verdict on all claims against him because his liability was directly linked to Norrod's.

## I

On the night of January 29, 1991, Barton, a Franklin, Kentucky resident, had a fight with his wife, and the local police were called. They took Barton from his home to the home of friends, Pat and Joe Coffee, to cool off. He didn't stay there long, however. From his friends' house, he went to the service station where his wife's car was sitting for sale. The station owner refused to give the keys to Barton, because he had apparently been drinking. Barton simply hot-wired the car and then proceeded to drive to Nashville, Tennessee. While in Nashville, he purchased beer after selling his wife's gun and then drove around the city. He also recalls visiting a Harley–Davidson motorcycle show and a nightclub called the Stagecoach, where he continued to drink. After going to the Stagecoach, Barton decided to drive home.

As he was driving north on Gallatin Road, he encountered a Nashville Metropolitan police officer, who was heading south. Because Barton noticed the police officer had put on his brakes, he decided to turn into a parking lot in order to avoid the officer. After the patrol car had passed, Barton pulled out of the parking lot and started heading in the opposite direction. Barton was unsuccessful in his attempt to evade detection by the officer, and a police pursuit ensued. By the end of the pursuit, members of the Nashville and Goodlettsville City Police Departments were involved.

Defendants Pack and Norrod, Tennessee Highway Patrol Officers, were patrolling in separate vehicles at the time and heard the radio report regarding Barton. Both joined the pursuit when Barton reached Interstate 65 and proceeded north.

As Barton approached the Kentucky state line, his car began having engine trouble and finally stopped approximately 100 feet into Kentucky. Barton was apprehended there after a struggle. He was then handcuffed and placed in the back seat of Norrod's patrol car. Around this time, Officer Johnny Patterson of the Franklin, Kentucky, Police Department arrived on the scene. Barton, recognizing Patterson, called out to him from the back of the patrol car and asked Patterson to take him to the Simpson County Jail, in Kentucky. Patterson refused and told Barton that there was nothing he could do. At trial, Patterson testified: "[H]e wanted to know if I would help ... take him over into Simpson County. I said you already in Simpson County. I done recognized him then. I said, Tony, nothing I can do, I said whatever took place took place in Tennessee, I said they got you now." Barton then began to kick the door of the patrol car, at which point Norrod re-entered the back seat. Barton claims that during this encounter Norrod beat him, hitting him several times in the back of the head. After this encounter, Barton was placed in flexcuffs and both his hands and feet were bound.

Shortly thereafter, Sergeant George Dittfurth, Pack's and Norrod's commanding officer, arrived on the scene. Kentucky State Police Trooper Tommy Smith also arrived on the scene. Sergeant Dittfurth asked Smith whether Kentucky would accept custody of Barton and take him before a magistrate. Smith conferred by radio with his commanding officer and then advised Sergeant Dittfurth that Kentucky did not want to take custody of Barton. Smith then told Sergeant Dittfurth that his commanding officer had instructed him that, if the Tennessee authorities wanted to take Barton, he was to let them take him back to Tennessee.

Sergeant Dittfurth asked Smith to transport Barton across the state line into Tennes-

see. Smith and Norrod then removed Barton from Norrod's patrol car and placed him in Smith's patrol car. Smith then transported Barton across the state line to a nearby Tennessee visitor's center, where Smith and Norrod moved Barton back into Norrod's patrol car. Norrod then took Barton to a local Tennessee hospital for treatment before taking him to the Robertson County Jail.

Although Pack did not directly participate in the transport of Barton across state lines, he was present during the entire episode.

Barton and his wife filed a complaint on January 30, 1992, in the United States District Court for the Western District of Kentucky. The complaint alleged that on January 30, 1991, Norrod and Pack deprived Barton of his civil rights under color of law, in violation of 42 U.S.C. § 1983. Barton claimed damages for the injuries he sustained as a result of alleged excessive force used by appellees in arresting him, in violation of his Fourth Amendment right against unreasonable seizure. He also alleged that he had been deprived of his civil rights guaranteed under Article IV, § 2, cl. 2,[1] of the United States Constitution and 18 U.S.C. § 3182:[2] "Defendant Norrod breached the duty to protect and preserve Plaintiff's extradition rights by illegally transporting Plaintiff Barton from the State of Kentucky to the State of Tennessee in an effort to conceal from Kentucky authorities the fact that Plaintiff had been the victim of excessive force during the course of his apprehension and arrest by Defendant Norrod." Plaintiff's Amended Complaint at 3. Ms.

Barton alleged a loss of her husband's services.

The case was set for trial on April 17, 1995. At the beginning of the trial, Ms. Barton orally moved to dismiss her claim. Her motion was granted.

At the close of Barton's proof, appellees moved to dismiss on the grounds that (1) there was no proof that Pack had personally used excessive force against Barton; (2) there was no clearly established right under the Constitution or federal laws protecting an individual against movement across state lines without complying with extradition procedures; and (3) Pack and Norrod had been sued in their official capacity only. Barton then moved to amend his complaint to conform to the proof pursuant to Fed.R.Civ.P. 12 to correct any defect caused by the failure of the pleadings to state clearly that appellees were being sued in their individual capacities.[3] The court granted Barton's motion. The court also granted a directed verdict in favor of Pack on the ground that there was insufficient evidence that he had used excessive force or that he had deprived Barton of any right under the Extradition Clause and statutes. The court reserved Norrod's motion for directed verdict.

At the close of all the proof, Barton moved for a directed verdict against Norrod on the claim that he had deprived Barton of his constitutional right to formal extradition procedures. The court denied this motion and granted Norrod's motion for directed verdict on the extradition claim because the court found that Norrod was protected by qualified immunity since no clearly established right

1. Article IV, § 2, cl. 2, provides:
 A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

2. 18 U.S.C. § 3182 provides:
 Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed trea-

son, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.

3. In the original complaint, Barton had referred to the defendants using their official titles.

exists in the Sixth Circuit to have officials comply with extradition procedures. The judge then denied Norrod's motion for a directed verdict on the Fourth Amendment claim, finding there was sufficient evidence for the jury to consider the issue. A jury returned a verdict in favor of Norrod, and judgment was entered in favor of Norrod and Pack on April 26, 1995.

On appeal, Barton claims that the district court erred in finding that Norrod was entitled to qualified immunity. He also argues that the district court erred in granting a directed verdict in favor of Pack.

## II

 In determining whether the district court erred in granting Norrod qualified immunity on the extradition claim, we note that application of the doctrine of qualified immunity is purely a question of law. Therefore, we review the district court's determination de novo. *Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir.1992). In *Harlow v. Fitzgerald*, the Supreme Court articulated the standard to be applied when determining whether an official is entitled to qualified immunity:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A determination of whether an official is entitled to qualified immunity focuses on the objective legal reasonableness of the official's action in light of clearly established law. *Ibid.* "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Additionally, the contours of the right must be sufficiently clear. It is not necessary that the very action have been previously held unlawful but, given the preexisting law, the unlawfulness of the conduct must have been apparent. *Garvie v. Jackson*, 845 F.2d 647, 650 (6th Cir.1988). In determining whether an official is entitled to qualified immunity, this

court asks whether the law was clearly established at the time of the alleged action. *See Mumford v. Zieba,* 4 F.3d 429, 433 (6th Cir.1993).

 Ordinarily, when looking to see if a clearly established right exists, we look to the decisions of the Supreme Court, of this circuit, and of courts within our circuit for guidance. *Cagle,* 957 F.2d at 1348. "Although decisions of other courts can clearly establish the law, such decisions must both point unmistakenly to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Ibid.* The right must be "so clearly established when the acts were committed that *any* officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir. 1987) (emphasis added).

 Barton concedes that the Supreme Court has not addressed the issue of whether failure to comply with extradition procedures before a transfer across state lines states a cause of action under § 1983. He also concedes that this court addressed the issue in *Stockwell* and found that such a right did not exist in this circuit. 272 F.2d at 386. Nevertheless, he urges this court to look outside the Sixth Circuit to those circuits that have found such a right exists, based on the cursory nature of the *Stockwell* opinion and because it was decided so long ago. He argues that this court should recognize a right under § 1983 since most of the circuits that have looked at the issue have done so. *See Draper v. Coombs,* 792 F.2d 915, 919–20 (9th Cir.1986) (claim alleging violation of federal extradition statute by demanding state and asylum state officers states a cause of action under § 1983); *Crumley v. Snead,* 620 F.2d 481, 483–84, (5th Cir.1980) (summary judgment inappropriate where evidence indicated that the sheriff was acting under color of state law when he delivered plaintiff to Tennessee authorities without awaiting the outcome of the habeas corpus proceeding chal-

lenging extradition); *Brown v. Nutsch,* 619 F.2d 758, 764 (8th Cir.1980) (§ 1983 provides a remedy for improper extradition by demanding state officers in violation of the Extradition Clause and statute); *Wirth v. Surles,* 562 F.2d 319, 323 (4th Cir.1977) (complaint alleging demanding state officer's arrest and transportation of fugitive without extradition proceedings created a cause of action under § 1983), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); *Sanders v. Conine,* 506 F.2d 530, 532 (10th Cir.1974) (complaint charging asylum state police officers and sheriff with noncompliance with extradition procedures stated a claim under § 1983); and *Ross v. Meagan,* 638 F.2d 646, 649–50 (3rd Cir.1981) (proof of arrestees' claim that police detective and governor of asylum state knowingly violated provisions of Uniform Criminal Extradition Act would entitle them to relief under § 1983); *cf. McBride v. Soos,* 594 F.2d 610

(7th Cir.1979), *on remand to* 512 F.Supp. 1207 (N.D.Ind.1981), *aff'd,* 679 F.2d 1223 (7th Cir.1982).

What Barton fails to recognize in his invitation for us to look outside this circuit is that *Stockwell* is good law. Thus, even were we to disagree with *Stockwell's* holding, it entitles Norrod to qualified immunity because it establishes that failure to comply with extradition procedures is not a clearly established right in *this* circuit. While *Stockwell* is a cursory per curiam opinion that relies on the reasoning of an unpublished district court opinion, Norrod was entitled to rely on it.[4] Moreover, the decisions of other courts do not "point unmistakenly to the unconstitutionality of the conduct." *Cagle,* 957 F.2d at 1348. While a majority of the circuits considering the issue have found a cognizable right for failure to comply with extradition procedures, other courts that

---

**4.** The *Stockwell* opinion states in its entirety:

> This case came to be heard on this first day of December, 1959, the appellant having been duly notified of the setting.
>
> The appeal has been heard and considered upon the brief and reply brief of appellant, Frank T. Stockwell, and upon the brief and oral argument of the appellee, appellant having made no appearance at the hearing in person or by attorney.
>
> The action of appellant was to recover damages for the alleged loss of his "constitutional rights while in the custody of the Toledo, Ohio, Police, and for the illegal procedures involved which brought about the illegal transportation of his person into the State of Michigan." He prayed an award of damages in the amount of Five Million Dollars (5,000,000) and that the amount awarded by the jury be tripled and declared tax free.
>
> We find no merit whatever in appellant's contention that his constitutional civil rights have been violated; and, for the reasons stated in the opinion of United States District Judge Kloeb, we affirm his order dismissing the complaint with prejudice.

272 F.2d at 386.

The amended complaint in *Stockwell* alleged that the defendants, officials of the Ohio Police Department and the Lucas County Prosecutor's Office, had conspired to deprive him of his constitutional rights and, "in doing so, did bring about his illegal transportation into the state of Michigan on December 18, 1953," in violation of 28 USC § 1343, 42 USC § 1983, and 42 USC § 1985(3). In an unpublished opinion, Judge Kloeb went through Stockwell's various claims, dismissing most of them because Stockwell had failed to provide any factual allegations against

many of the named defendants. As to the extradition claim, Judge Kloeb's opinion is not much more insightful than this court's *Stockwell* opinion. He writes, "We fail to find, in this allegation, any breach of [28 USC § 1343, 42 USC § 1983, or 42 USC § 1985(3)]." *Stockwell v. Friberg,* No. 8119 (N.D. Ohio filed Mar. 3, 1959).

The United States District Court for the Eastern District of Tennessee in *Martin v. Sams* has interpreted *Stockwell* as indicating that "the Sixth Circuit ... is aligned with the line of reasoning that improper extradition does not violate any federal rights, giving rise to a cause of action under Section 1983." 600 F.Supp. 71, 72 (E.D.Tenn.1984). Other courts have also construed *Stockwell* as stating that failure to provide formal extradition procedures under § 1983 is not a cognizable right in this circuit. *See Ortega v. City of Kansas City,* 659 F.Supp. 1201, 1208 (D.Kan.1987) ("The Sixth Circuit is the only appellate court that has declined to recognize a section 1983 cause of action for violation of extradition rights."), *rev'd,* 875 F.2d 1497 (10th Cir.), *cert. denied,* 493 U.S. 934, 110 S.Ct. 325, 107 L.Ed.2d 315 (1989); *Elliott v. Johnson,* 816 S.W.2d 332, 338 (Tenn.Crim.App.1991) ("We note, however, that the Sixth Circuit has apparently taken the position that the federal constitutional and statutory provisions are not designed to protect the rights of fugitives but are to facilitate interstate justice administration. Thus, a failure to comply with established extradition procedures within that area of jurisdiction does not deprive the fugitive of any protected rights."); *Sneed v. State,* 872 S.W.2d 930, 935 n. 2 (Tenn.Crim.App.1993) ("The Sixth Circuit is the only federal appeals court that has declined to recognize a § 1983 cause of action for violation of extradition rights.").

have considered the issue have not. See Sami v. United States, 617 F.2d 755, 773–74 (D.C.Cir.1979) (finding that the Constitution's extradition provision applies only to interstate extradition not international extradition and stating in dicta that "the traditional reading of the constitutional [extradition] provision has been that it confers no rights on the individual being sought"); Martin v. Sams, 600 F.Supp. 71, 72 (E.D.Tenn.1984) (even though formal extradition procedures were not followed, there was no cognizable cause of action under § 1983); Giano v. Martino, 673 F.Supp. 92, 93–94 (E.D.N.Y.) (even if police officers violated the Uniform Extradition Act, extradited arrestee had no claim under § 1983 for such violation), aff'd without opinion, 835 F.2d 1429 (2d Cir.1987); see also Hines v. Guthrey, 342 F.Supp. 594, 595 (W.D.Va.1972) (Constitutional provision for interstate extradition of fugitives and federal statutes enacted thereunder were designed to benefit the state, not the fugitive), disagreed with in Wirth, 562 F.2d at 322; and Johnson v. Buie, 312 F.Supp. 1349, 1351 (W.D.Mo.1970) ("[O]ne who has been convicted of the charged offense in the convicting state cannot maintain an action for damages under the Federal Civil Rights Act against those who allegedly forcibly abducted him from an asylum state."), overruled by Brown, 619 F.2d at 764. At most, the weight of authority leans in the direction of finding a right of action. A reasonable officer could believe that the decisions of our circuit, and of the other courts cited in this paragraph, represent the better view of the law. In addition, very few of the cases taking the contrary position involve the situation that we have here, where the fugitive has been captured in hot pursuit by the officers of the demanding state, officers of the asylum state either never formally taking charge of the prisoner, or doing so only for the specific purpose of transferring him across the state border, and where the demanding state's officers did not ultimately have the responsibility for taking the prisoner back into their states.

In light of Stockwell and the cases interpreting it, it is clear that decisions outside the circuit finding that such a right exists do not so "clearly foreshadow[ ] . . . applicable

direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." Cagle, 957 F.2d at 1348. The district court, therefore, did not err in granting Norrod's motion for directed verdict on the extradition claim since he was entitled to qualified immunity.

### III

■ Additionally, we believe Stockwell was correctly decided despite its cursory nature. Although a number of courts allow a § 1983 claim when officers fail to comply with extradition procedures established by the Uniform Criminal Extradition Act ("UCEA"), we believe that the constitutional and statutory extradition provisions are not designed to protect fugitives. Rather, they are designed to facilitate the administration of justice between states. Thus, failure to comply with established procedures does not deprive the fugitive of any protected right. To hold otherwise would mean that, even in a situation of hot pursuit and an uncertain border, a fugitive would have secured a variety of valuable personal rights simply by making it "all-ee all-ee in free" across the state line. Section 1983, unlike football, should not be a game of inches.

Article IV, § 2, cl. 2 of the United States Constitution authorizes the extradition of fugitives from justice and was designed, in effect, to eliminate the boundaries between the states for the purpose of extradition:

> The language [used in the Clause] was not used to express the law of extradition as usually prevailing among independent nations but to provide a summary executive proceeding by the use of which the closely associated states of the Union could promptly aid one another in bringing to trial persons accused of crime by preventing their finding in one state an asylum against the processes of justice of another. Such a provision was necessary to prevent the very general requirement of the state Constitutions that persons accused of crime shall be tried in the county or district in which the crime shall have been committed from becoming a shield for the guilty rather than the defense for the inno-

cent, which it was intended to be. Its design was and is, in effect, to eliminate, for this purpose, the boundaries of states, so that each may reach out and bring to speedy trial offenders against its laws from any part of the land.

*Biddinger v. Commissioner of Police,* 245 U.S. 128, 132–33, 38 S.Ct. 41, 42–43, 62 L.Ed. 193 (1917) (citations omitted).

While the framers intended the Extradition Clause to facilitate the administration of justice between states, the Clause has never been considered self-executing because it does not establish procedures by which interstate extradition is to take place. *California v. Superior Court,* 482 U.S. 400, 406, 107 S.Ct. 2433, 2437–38, 96 L.Ed.2d 332 (1987). This, however, was remedied early in our history when Congress responded to the deficiency by enacting the Extradition Act of 1793.[5] Congress enacted the statute in response to a bitter dispute between the states of Virginia and Pennsylvania. In 1791,

Pennsylvania had demanded the extradition of three men charged with kidnaping a free Black man and selling him into slavery, and Virginia had refused. *Superior Court,* 482 U.S. at 406, 107 S.Ct. at 2437–38.

■ Section 3182 was thus enacted to place a duty on the asylum state to deliver up a fugitive against whom a properly certified indictment or affidavit charging a crime is lodged. *Id.* at 407, 107 S.Ct. at 2438. As with the debates leading to the inclusion of the Extradition Clause, the debates over the federal extradition statute reveal no concern for the need to protect fugitive rights. Rather, the act was intended to facilitate the extradition process. Manheimer, *supra* note 5, at 1281. Because the federal statute simply provides the framework for the extradition process, the actual procedures for extradition are a matter of state law. *Martin,* 600 F.Supp. at 72.[6]

---

5. The current version of the Extradition Act is codified at 18 U.S.C. § 3182. The current statute is substantially similar to the original. It has only been modified to (1) eliminate any reference to slaves; (2) extend coverage to any state or territory of the United States; and (3) reduce the time period in which an agent from the demanding state must appear from six months to 30 days. Jacob A. Manheimer, Note, *Interstate Rendition Violations and Section 1983: Locating the Federal Rights of Fugitives,* 50 Fordham L.Rev. 1268, 1271 n. 21 (1982).

6. Because the federal extradition act failed to address the specific procedures to be followed, the National Conference of Commissioners on Uniform State Laws approved in 1926 a draft of the Uniform Criminal Extradition Act. The UCEA was revised in 1936 and has been adopted by forty-eight states, including Tennessee and Kentucky. Manheimer, *supra* note 5, at 1272. The Tennessee version of the UCEA is codified at Tenn.Code Ann. §§ 40–9–101 to 40–9–130 (1990); the Kentucky version is codified at Ky. Rev.Stat.Ann. §§ 440.010 to 440.340 (Michie 1985). Among its provisions, the UCEA requires that the arrested party be taken before a judge to be informed of the demand for his surrender, the charges against him, of his right to counsel, and of his right to challenge the extradition process by writ of habeas corpus. Tenn.Code Ann. § 40–9–119 and Ky.Rev.Stat.Ann. § 440.250.

Some courts have failed to recognize a § 1983 action for failure to comply with extradition procedures on the theory that the actual procedures violated are a matter of state law. Thus, they conclude that no federal right is implicated in

their violation. *See, e.g., Giano,* 673 F.Supp. at 92 and *Raffone v. Sullivan,* 436 F.Supp. 939 (D.Conn.1977), *remanded without opinion,* 595 F.2d 1209 (2d Cir.1979). We believe the better view is that the Constitution and extradition statute protect no personal rights since their purpose is to benefit the demanding state and specify the duties of the asylum state. *Cf. Alabama v. Engler,* 85 F.3d 1205 (6th Cir.1996). Moreover, *Cuyler v. Adams* suggests that the UCEA should be treated as federal law. 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). We recognize that *Cuyler* is not dispositive on the issue since it applied to the Interstate Agreement on Detainers and not to the UCEA and the Court expressly stated that it did not "decide ... whether the cited examples of 'reciprocal legislation in the criminal area' [including the UCEA] have received congressional consent or whether the subject matter of any of the cited Acts is an appropriate subject for congressional legislation." *Id.* at 442 n. 10, 101 S.Ct. at 708 n. 10. Nevertheless, the rationale for holding that the Interstate Agreement on Detainers is a matter of federal law would apply equally to the UCEA. The UCEA furthers the purpose of the Crime Control Consent Act of 1934, codified at 4 U.S.C. § 112, and addresses extradition, a subject that is appropriate for congressional legislation. Moreover, action by Congress is not necessary: "Congress may consent to an interstate compact by authorizing joint state action in advance or by giving expressed or implied approval to an agreement the States have already joined." *Id.* at 441, 101 S.Ct. at 708; *but see Giano,* 673 F.Supp. at 95.

■ Neither the Extradition Clause of the Constitution nor the federal extradition statute purports to confer any right on the fugitive. Rather, they confer rights and duties on the executive authorities of the states. The legislative history of both the Extradition Clause and statute clearly indicate that they were simply intended to formalize the summary extradition procedures practiced by the colonies. Manheimer, *supra* note 5, at 1280. This purpose is clearly reflected in the Supreme Court cases dealing with interstate extradition. The Court has repeatedly articulated the purpose behind the Extradition Clause of the Constitution as one of comity between states:

> The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus "balkanize" the administration of criminal justice among the several states. It articulated, in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art. IV. The Extradition Clause, like the Commerce Clause served important national objectives of a newly developing country striving to foster national unity. In the administration of justice, no less than in trade and commerce, national unity was thought to be served by de-emphasizing state lines for certain purposes, without impinging on essential state autonomy.

*Michigan v. Doran*, 439 U.S. 282, 287–88, 99 S.Ct. 530, 534–35, 58 L.Ed.2d 521 (1978) (citations omitted).

■ Because interstate extradition is intended to be a summary and mandatory executive proceeding, the Court has made clear that care must be taken to ensure that the process is not overburdened:

> [C]are must be taken [to ensure] that the process of extradition [is] not so burdened as to make it practically valueless. It is but one step in securing the presence of the defendant in the court in which he may be tried....

*In re Strauss*, 197 U.S. 324, 333, 25 S.Ct. 535, 537–38, 49 L.Ed. 774 (1905). While a fugitive may attack the proposed extradition by writ of habeas corpus, a court considering release on habeas corpus can do no more than decide whether (1) the extradition documents on their face are in order; (2) the petitioner has been charged with a crime in the demanding state; (3) the petitioner is the person named in the request for extradition; and (4) the petitioner is a fugitive. *Doran*, 439 U.S. at 289, 99 S.Ct. at 535–36. To allow any more would "defeat the plain purposes of the summary and mandatory procedures authorized by Art. IV, § 2." *Id.* at 290, 99 S.Ct. at 536.

Courts that have recognized a § 1983 claim for failure to comply with extradition procedures have found that the right to petition for writ of habeas corpus is among those procedural safeguards that indicate fugitives' rights are protected by the Act. These courts, however, have failed to examine the legislative history and Supreme Court precedent on interstate extradition. They simply extract the right from those provisions in the UCEA benefitting the fugitive. Benefit alone, however, does not necessarily mean that Congress intended the statute to confer rights upon certain individuals. If it did, nearly every federal statute would be a basis for a § 1983 claim since arguably every federal statute benefits at least some individual. Manheimer, *supra* note 5, at 1281–82. "The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). We believe in this instance the legislative history clearly indicates Congress did not intend to confer such rights upon fugitives.

Moreover, we believe that to allow a fugitive to proceed against officers of the demanding state for failure to comply with extradition procedures would, in effect, recognize the right of asylum in the state to which the fugitive has fled. In *Mahon v. Justice*, the Supreme Court made clear that no such right is supported by the Extradition Clause and statute. 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283 (1888). In that case, a fugitive from justice was kidnapped in West Virginia and forcibly carried back to Kentucky. His release was sought by writ of habeas corpus on a theory that under the constitution and laws of the United States,

the fugitive had a right of asylum in the state to which he fled except when removed in compliance with extradition procedures. This theory was flatly rejected by the Supreme Court and the Court has never wavered from this position. *See Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) and *Lascelles v. Georgia*, 148 U.S. 537, 13 S.Ct. 687, 37 L.Ed. 549 (1893).

Additionally, we find instructive the Supreme Court teachings, upholding the conviction of fugitives who have been returned to the demanding state without strict compliance with extradition procedures. In those cases, the Court has made clear that the "sole object of the provision of the constitution, and the act of congress to carry it into effect, is to secure the surrender of persons accused of crime, who have fled from the justice of the state whose laws they are charged with violating." *Lascelles*, 148 U.S. at 542, 13 S.Ct. at 689.

 A fugitive can challenge extradition by petitioning for a writ of habeas corpus, but the purpose of the writ is very limited because it only affects his detention in the asylum state. It does not affect the underlying charges against him. *Buie*, 312 F.Supp. at 1351 ("The theory behind permitting the fugitive to petition for habeas corpus in the asylum state is that it is a method of challenging the legality of his detention there."). Once the fugitive is returned to the demanding state, the right to challenge extradition becomes moot: the fugitive is no longer being detained by the asylum state, and so, the legality of his or her detention there is no longer at issue. We believe those

courts that have suggested that deprivation of the right to file a habeas corpus petition alone is sufficient to state a § 1983 cause of action are misguided. *See Crumley*, 620 F.2d at 483, and *Morrison v. Stepanski*, 839 F.Supp. 1130, 1136 (M.D.Pa.1993). The fact that a fugitive no longer has a right to petition for a writ of habeas corpus challenging extradition does not mean that he is left without constitutional protection. "[I]n delivering up an accused person to the authorities of a sister state [asylum state officials] are not sending him for trial to an alien jurisdiction, with laws which our standards might condemn, but are simply returning him to be tried, still under the protection of the federal Constitution but in the manner provided by the state against the laws of which it is charged that he has offended." *Biddinger*, 245 U.S. at 133, 38 S.Ct. at 43.

Moreover, no constitutional protection is lost, since the extradition proceedings cannot inquire into the guilt or innocence of the charged party. *See Superior Court*, 482 U.S. at 408, 107 S.Ct. at 2438–39. While we do not condone officials who fail to comply with extradition procedures, a fugitive's rights are sufficiently protected by those limitations placed on the demanding state by the Constitution when determining his guilt or innocence. And the Constitution "is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." *Buie*, 312 F.Supp. at 1351. Allowing an additional layer of constitutional challenge affords the fugitive little benefit,[7] while placing an unnecessary burden on the

---

7. Even the courts that have recognized a cause of action under § 1983 for failure to comply with extradition procedures have noted that simply being transported across state lines does not cause injury. A plaintiff has to allege a specific injury as a result of the official's failure to comply with extradition procedure. *See, e.g., Morrison*, 839 F.Supp. at 1143; *McBride*, 594 F.2d at 613; *Brown*, 619 F.2d at 764. Other courts have even denied recovery altogether under § 1983 to fugitives who have been convicted for the crime for which they have been transported from the asylum state. *See, e.g., Raffone*, 436 F.Supp. at 939; *Shank v. Spruill*, 406 F.2d 756 (5th Cir.1969); *Crawford v. Lydick*, 179 F.Supp. 211 (W.D.Mich.1959), *aff'd*, 280 F.2d 426 (6th Cir.), *cert. denied*, 364 U.S. 849, 81 S.Ct. 93, 5

L.Ed.2d 72 (1960). Because being transported across state lines without compliance with extradition procedures, without more, does not cause injury, it does not make sense to create a cause of action. This is especially true where, as here, the state has a significant interest in the summary nature of the proceedings. Moreover, any additional injury that a fugitive could allege that would be sufficient to recover under a § 1983 claim for failure to comply with extradition procedures is likely sufficient to constitute its own § 1983 claim. For example, in this case, Barton alleged that Norrod violated his Fourth Amendment right against unreasonable seizure by beating him. Had he been able to convince the jury that Norrod violated this right, he would have been able to recover for that violation.

extradition process, something the Supreme Court has stressed must not be done. *See In re Strauss,* 197 U.S. at 332–33, 25 S.Ct. at 537–38.

In this case, had Barton first been taken to the Simpson County Jail and extradition had then properly been sought, any challenge he might have made to his extradition would have failed. Ultimately, the only unresolved question under such a habeas inquiry is whether the extradition documents on their face were in order. However, the requirement of such documents is for the benefit of the asylum state, not for the defendant.[8]

## IV

Barton's second alleged error need not detain us long. He argues that the district court erred in granting a directed verdict in favor of Pack because the issue of whether Pack violated his right to formal extradition proceedings should have been submitted to the jury.

Barton's basic contention is that, because Pack was present when the alleged constitutional violations were occurring, he had a duty to intervene. Barton is correct that a non-supervisory law enforcement officer present at a scene where other officers are violating a person's civil rights may have a duty to intervene. *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982) ("plaintiff was entitled to have his case against defendants Moran, Pfeiffer and Finnin submitted to the jury upon his having offered testimony that he was beaten by unknown officers in their presence"), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). Nevertheless, Barton's argument is without merit. While Barton cites the proposition correctly, he fails to recognize that there was no right being violated. As held above, there is no constitutionally protected individual right to compliance with formal extradition proce-

dures. Consequently, there was no right being violated for which Pack had a duty to intervene and protect.

Even if such a right did exist, it certainly was not a clearly established right at the time of Barton's arrest. Accordingly, Pack was entitled to qualified immunity on the charge that he failed to intervene and stop the extradition. Simply put, there was no clearly established right being violated for which Pack had a duty to intervene and protect. As a result, the issue of whether Pack violated Barton's civil rights by failing to intervene and stop Norrod from transporting him from Kentucky to Tennessee without complying with formal extradition procedures could not be an appropriate question for the jury.

Moreover, although *Bruner* establishes that Pack may be held liable for failing to intervene, essential to finding him liable is the culpability of Norrod, whose malfeasance Barton alleges caused the deprivation of his civil rights. *Bills v. Aseltine,* 52 F.3d 596, 604 (6th Cir.) (finding that Aseltine's culpability was necessary to any liability of the other officers: "Aseltine actively performed ... what they merely failed to prevent.... The officers' alleged violations were, in essence, 'lesser included offenses' ... so that the jury's finding that Aseltine acted reasonably must mean that there can be no liability for failing to prevent 'reasonable' actions."), *cert. denied,* — U.S. —, 116 S.Ct. 179, 133 L.Ed.2d 118 (1995). Thus, for Pack to be liable, Norrod would have had to have been found liable for violating Barton's civil rights. Because the district court correctly concluded that Barton did not have a cognizable claim under § 1983 against Norrod for failure to follow formal extradition procedures, there was simply no liability that could attach to Pack with respect to the extradition claim.

8. It would not have been necessary for a warrant for Barton's arrest to have been issued before Kentucky officers could have taken Barton into custody. The UCEA, as codified by both Kentucky and Tennessee, allows for warrantless arrests upon reasonable information that the fugitive would be charged with a crime in the demanding state. *See* Tenn.Code Ann. § 40–9–104 and Ky.Rev.Stat.Ann. § 440.280. These provi-

sions allow for a fugitive to be arrested without a warrant by a peace officer of the asylum state for detention for the reasonable time necessary to enable a requisition for him to be regularly made. The facts in this case clearly establish that the Kentucky officers had sufficient information to know that Barton would be charged with a crime in Tennessee.

## V

We therefore **AFFIRM** the district court's judgment in all respects.